ACCOKEEK, MATTAWOMAN, PISCATAWAY CREEKS COMMUNITY COUNCIL v. PUBLIC SERVICE COMMISSION (S.T. 2016, No. 26)

PSC granted a Certificate of Public Convenience and Necessity (CPCN) that authorized Dominion Cove Point LNG (Dominion) to build an electric generating station to support an expansion of its liquefied natural gas facility at Cove Point, in Calvert County. In deciding whether to grant the CPCN, PSC was required to consider the economic and environmental impact of the generating station on the State and county. The CPCN was subject to nearly 200 Conditions imposed by PSC designed to ameliorate adverse economic and environmental effects that may result from the construction and operation of the generating station.

In a judicial review action, Accokeek claimed that (1) two of the Conditions, which required Dominion to make contributions to State programs designed to reduce greenhouse gas emissions and to assist low-income families in meeting utility bills, constituted an unauthorized tax, (2) the failure of PSC to specify the precise dollar value of the positive economic benefit to the State and county of the generating station deprived Accokeek of due process, and (3) there was insufficient evidence to support PSC's findings regarding the positive economic benefit of the generating station.

Affirming judgments of the Circuit Court for Baltimore City and the Court of Special Appeals, the Court of Appeals rejected Accokeek's complaints and held that (1) the two conditions complained of were not in the nature of a tax but were regulatory measures within the authority of PSC to impose, (2) PSC make appropriate findings regarding economic benefit based on the record, and (3) the evidence was sufficient to support those findings.

Circuit Court for
Baltimore City
Case No. 24-C-14-003896/AA
Argued 11/7/16

IN THE COURT OF APPEALS

OF MARYLAND

No. 26
September Term, 2016

ACCOKEEK, MATTAWOMAN,
PISCATAWAY CREEKS COMMUNITY
COUNCIL, INC.

vs.

PUBLIC SERVICE COMMISSION OF
MARYLAND, et al.

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Getty, JJ.
Wilner, Alan M.,
        (Senior Judge, Specially Assigned)

Opinion by Wilner, J.

Filed: December 16, 2016

Dominion Cove Point LNG, LP (Dominion) owns and operates a liquefied natural gas (LNG) terminal near Cove Point in Calvert County. As initially constructed, the terminal received LNG from tanker ships, stored it, and, upon a customer's need, vaporized it and shipped it in gas form through a pipeline that connects the terminal to a local distribution company. That operation is ongoing. The terminal and its operation are subject to approval and regulation by the Federal Energy Regulatory Commission (FERC). *See* 15 U.S.C. §717b.

In April 2013, Dominion applied to FERC and the Maryland Public Service Commission (PSC) for authorization to expand the terminal into a "bi-directional" facility, so that it could both import and export LNG. Exporting would be a reverse process – Dominion would obtain the domestic product in gas form, liquefy it, and ship it abroad in its liquid form. PSC approval, through the grant of a Certificate of Public Convenience and Necessity (CPCN), was needed because, as part of the expansion Project, Dominion proposed to construct a 130-megawatt electric generating station to provide the electricity necessary for the expanded operation, and, under Md. Code, Public Utility Article (PUA), §§7-207 and 7-208, a CPCN from PSC was required for the construction of that station. Petitioner, Accokeek, Mattawoman, Piscataway Creeks Community Council, Inc. (hereafter AMP), a consortium dedicated to protecting local waterways, was allowed to intervene in the administrative proceeding in opposition to Dominion's application.

After three days of hearings and consideration of several thousands of pages of testimony and documents, PSC entered an 83-page Order granting the CPCN, subject to approximately 200 Conditions included in a 64-page Appendix. Dissatisfied, AMP sought judicial review in the Circuit Court for Baltimore City, which affirmed the PSC Order. On AMP's appeal, the Court of Special Appeals affirmed the Circuit Court judgment. *Accokeek, Mattawoman & Piscataway v. PSC*, 227 Md. App. 265, 133 A.3d 1228 (2016).

We granted *certiorari* to consider three issues raised by AMP:

(1) whether two of the Conditions imposed by PSC in its grant of the CPCN (Conditions J-3 and J-4) constitute taxes or mandatory payments that PSC had no authority to impose;

(2) whether PSC's (alleged) failure to identify the value it assigned to positive economic value in favor of the CPCN prevented AMP from effectively challenging the PSC decision; and

(3) whether PSC's valuation of the economic benefit created by the generating station is not supported by substantial evidence in the record.

As did the two lower courts, we find no merit in these complaints and therefore shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

The procedure to be followed by PSC in evaluating a CPCN application for construction of an electric generating station is set forth in PUA §§7-207(c) and (d). Those sections provide for notice to interested persons and a public hearing, and no one contends that those procedures were not followed in this case. Section 7-207(e) lists the factors that PSC must consider in determining whether to grant a CPCN. In relevant part, they are:

> (1) the recommendation of the governing body of the county in which the station is to be located; and

> (2) the effect of the station on:
>    (A) the stability and reliability of the electric system;
>    (B) economics;
>    (C) esthetics;
>
>    (D) historic sites;
>
>    (E) aviation safety;
>
>    (F) air and water pollution; and
>
>    (G) availability of means for the timely disposal of waste produced by the generating station.

Evidence was presented on all of those factors, by Dominion, by the Maryland Power Plant Research Program (PPRP), a unit and coordinating body within the Department of Natural Resources, by the PSC Staff, by the Sierra Club, by AMP, and by others. AMP essentially argued that none of the considerations in §7-207 favored the granting of a CPCN, including the assertion that the unanimous recommendation of the Calvert County Board of County Commissioners that the CPCN be granted was invalid

3

and that, because the generating station would serve only the LNG operation at the terminal and not connect to the electric power grid[1], it would have no public benefit that could offset the pollution that would occur from its fossil-fuel based generation.

PPRP included in its Report and testimony a substantial list of Conditions necessary, in its view, for the Project to comply with environmental requirements or to ameliorate negative economic impacts of the Project. It concluded that, with those Conditions, the generating station would comply with all applicable environmental requirements. The PSC Staff submitted a report dealing with the impact of the generating station on the electric power grid. Subject to its list of Conditions, the Staff concluded that the station would not adversely affect the grid. Dominion accepted the Conditions proposed by PPRP and the PSC Staff.

One of the major problems with which the parties and PSC had to contend, particularly in attempting to estimate and evaluate the economic and environmental impacts of the Project, was that the generating station was needed, and was intended to be used, solely to support the export operation – to run the compressors necessary to liquefy the domestic gas. No part of the electricity to be generated was to connect with the grid or be sold to customers. Because of that, in some important respects it was difficult to estimate the impact of the generating station as a stand-alone entity, apart from the

---

[1] The electric grid is a complex network for distributing electricity throughout the country through interconnected generators of electricity, high-power transmission lines, and lower power distribution lines.

4

overall LNG Project. Both Dominion and PPRP took the position that the generating station was so intertwined with the overall Project that it was impossible to evaluate the impact of the generating station as a separate item, and they made little or no effort to do so.[2]

Though lamenting the lack of evidence from Dominion and PPRP directed solely to the generating station, PSC recognized the problem. It noted in its Order "that the Generating Station and the larger liquefaction Project are integrally related" and that its task had been made more difficult "by the fact that [Dominion], and, to some extent, other parties, have provided testimony that addresses the Project as a whole and have not seriously attempted to isolate information that applies uniquely to the Generating Station that we must review."[3] It concluded, however, that:

(1) the environmental impacts of the generating facility had to be evaluated "as part of the entire project" pursuant to the requirements of the Federal Clean Air Act, and

---

[2] Commenting on the proposed CPCN application on behalf of the Secretaries of the Departments of Natural Resources, Agriculture, Business and Economic Development, Environment, Planning, and Transportation and the Director of the Maryland Energy Administration, PPRP stated, in its Introduction: "Although the proposed generating station is only a portion of the proposed Project, many of the impacts from constructing and operating the electric generating equipment cannot be separated from the larger project and, thus, cannot be evaluated on a stand-alone basis. Therefore, the State's review of impacts to resources was not limited to the generation plant, but rather examined the proposed Project as a whole." That was consistent with Dominion's position. Neither PSC nor AMP has suggested what additional stand-alone evidence **could** have been produced.

[3] PSC noted that the oral testimony estimated that "the effects of the generating facilities may account for between 5% and 20% of the overall effects of the Project, but we have nothing beyond that to further refine the appropriate number."

5

similarly, the evaluation of potential safety and security impacts of siting the generating station adjacent to and intertwined with the liquefaction facility and storage tanks also needed to take into account the possibility of a combined accident; but

(2) the economic and reliability impacts of the generating station can be evaluated independently of the economic impacts of the liquefaction facility, which would be reviewed by FERC.

Applying that decision where applicable, PSC concluded:

(1)     As to §7-201(e)(1), the Calvert County Board of Commissioners unanimously supported the CPCN.

(2)     As to §7-207(e)(2)(i) – stability and reliability of the electric system – because there would be no tie between the generating station and the grid, there was no evidence that the station would contribute to the grid or have any adverse effect on it.

(3)     As to §7-207(e)(2)(iii), (iv), (v), and (vii) – esthetics, historic sites, aviation safety, and waste disposal – that the Conditions proposed by PPRP would adequately address the concerns raised by AMP and the Sierra Club.

The major part of PSC's discussion concerned §§7-207(e)(2)(ii) and (vi) – economics and pollution. The analysis of economic impact was a multi-phase one, involving both positive and negative effects.

With respect to positive effects, PSC noted that PPRP's economic consultant, Dr. Peter Hall, estimated that the employment and income effects of the LNG Project would be significant but that only a small portion of those effects would be attributable to the

6

generating station. Dominion did not provide an estimate of the employment impact but proffered that approximately 20 percent of the "dollar impact" from the overall Project could be attributed to the generating station. PPRP's estimate was much lower – five percent of total temporary construction jobs and two percent of overall wages. PSC noted the variance but acknowledged that it had "nothing beyond that to further refine the appropriate number."

Dominion estimated that it would pay $40 million in new revenue to Calvert County through a Payment in Lieu of Taxes (PILOT) agreement with the county. The county estimated that it would receive an average of $55 million in annual revenue once the facility was completed. AMP argued that annual payments to the county would amount to only $34 million. PSC found that (1) because it would not be connected to the grid, the generating station would provide no economic benefit to Maryland consumers as a source of electricity, and (2) because it would be exempt from purchasing Regional Greenhouse Gas Initiative (RGGI) carbon emission allowances, even though it would emit significant carbon emissions, it would not contribute to the strategic energy infrastructure. As a result, not only would there be no benefit from the purchase of RGGI allowances, but there would be a loss of industrial allowances that might otherwise be used by a future industrial project or power plant.

PSC considered the more substantial economic impacts in its evaluation of the statutory factors. It noted a conclusion by Dominion's Consultant, Navigant Consulting, Inc., that, due to the additional demand created by the exporting of natural gas from the

7

Cove Point facility, the price of natural gas would increase 5.7 percent by 2020, which would translate into an incremental cost to Maryland consumers of $26.8 million per year in real dollars, to which must be added a loss of $16 million in revenues associated with compliance costs through year 2020. PSC estimated that the annual costs to Maryland consumers could exceed $75 million by 2025. It noted as well, as negative factors, the increased emissions of pollutants, Dominion's use of a limited supply of industrial greenhouse gas emission allowances, increased noise, cutting of trees, and the burden on transportation infrastructure and water resources.

Based on the record, PSC concluded that construction of the generating station with just the conditions proposed by PPRP would not provide sufficient economic and other benefits to residents of Maryland to justify granting a CPCN.

In the aggregate, it found that "the negatives created by the construction and operation of the Generating Station require the provision of additional economic benefits to the State before the CPCN can be approved." It concluded that Dominion's last minute agreement to a $20.38 million in-kind contribution to support Maryland's Greenhouse Gas Reduction Act goals (Condition J-4) was "too speculative and insufficient" to provide the necessary offsetting economic benefits. In place of that, the PSC focused on contributions that would benefit both the environmental and economic interests of the State by benefitting renewable and clean energy resources, mitigating climate change effects, and promoting beneficial changes in generation and electric usage by consumers.

8

To those ends, it proposed, as a substitute J-4 Condition, that Dominion contribute $40 million, over a five-year period, to the State's Strategic Energy Investment Fund (SEIF), a Fund administered by the Maryland Energy Administration, to be used for the purpose of investing in the promotion, development, and implementation of renewable and clean energy resources, greenhouse gas reduction or mitigation programs, cost-efficiency and conservation programs, or demand response programs designed to promote changes in electric usage by customers.

PSC also found the proposed J-3 Condition – a one-time $400,000 contribution to the Maryland Energy Assistance Program (MEAP) to offset the impact from the Project of increasing natural gas rates to Maryland consumers – to be inadequate. It directed instead that that contribution be increased 20-fold – an **annual** contribution of $400,000 to MEAP or other low income assistance programs to be specified by PSC for a period of 20 years, a total of $8 million.

The overall conclusion of PSC, stated in its Order, was that:

"if all conditions imposed under this Order are met to address environmental, economic, health and safety impacts demonstrated in this proceeding, the Generating Station can be built in conformity with applicable Maryland and Federal laws and standards; and in a way that will be consistent with the public convenience and necessity standard."

Dominion was given ten days to determine whether to accept the modified Conditions. The company timely accepted them, and the Order became final.

9

**STANDARD OF REVIEW**

As recently stated in *Hollingsworth v. Severstal Sparrows Point*, 448 Md. 648, 654, 141 A.3d 90, 93 (2016), "[i]n an appeal from judicial review of an agency action, we review the agency's decision directly, not the decision of the Circuit Court or the Court of Special Appeals."

The general standard, or scope, of review of final PSC Orders is set forth in PUA §3-203. A PSC Order is prima facie correct and shall be affirmed unless it is clearly shown to be (1) unconstitutional, (2) outside PSC's statutory authority or jurisdiction, (3) made on unlawful procedure, (4) arbitrary or capricious, (5) affected by other error of law, or (6) if entered in a contested proceeding after a hearing, which the Order before us was, it is unsupported by substantial evidence in the record considered as a whole.

In *CWA v. Public Service Commission*, 424 Md. 418, 36 A.3d 449 (2012), we put the familiar gloss on that, noting that, although questions of law are "completely subject to review by courts," as a general matter, "[s]o long as a reasoning mind could have reached the same conclusion as the agency, we will not disturb the agency's decision" and that because PSC "is well informed by its own expertise and specialized staff, a court reviewing a factual matter will not substitute its own judgment on review of a fairly debatable matter." Confirming earlier pronouncements, we added that "[a]s long as an administrative agency's exercise of discretion does not violate regulations, statutes, common law principles, due process or other constitutional requirements, it is ordinarily unreviewable by the courts." In *Easton v. PSC*, 379 Md. 21, 30, 838 A.2d 1225,

10

(2003), we added that a PSC decision will not be disturbed on the basis of a factual question "except upon clear and satisfactory evidence that it was unlawful and unreasonable."

These principles are in general accord with those applied to most judicial review actions (s*ee Cashcall & Reddam v. Comm'r of Fin. Reg.*, 448 Md. 412, 426, 139 A.3d 990, 998-99 (2016)), but this Court has tended to accord particular deference (though not total deference) to PSC decisions. As noted in *Balto. Gas & Elec. v. Public Serv. Comm'n*, 305 Md. 145, 170, 501 A.2d 1307, 1320 (1986), "[i]n light of [the predecessor statute to PUA §3-203], we have consistently held that [PSC] orders enjoy a high degree of judicial deference on review. . . . Recognizing the experience and special expertise of the Commission and its staff, a reviewing court must not substitute its judgment for that of the Commission." *See* also *People's Counsel v. MPSC*, 355 Md. 1, 14, 733 A.2d 996, 1003 (1999) (PSC decision "is accorded the respect due an informed governmental agency that is aided by a competent and experienced staff.")

## CONDITIONS J-3 AND J-4

Conditions J-3 and J-4 emanated initially from PPRP in an April 17, 2014 submission. Condition J-3 directed that, prior to operation of the facility, Dominion make a one-time contribution of $400,000 to MEAP or other Maryland low income

11

energy assistance program to be specified by PSC.[4]  Its explanation for this Condition

was exceedingly brief.  It argued that the contribution "offsets some of the burden low

income Marylanders may face if the project does indirectly cause higher natural gas

prices for Maryland consumers."

Condition J-4 was that Dominion provide $20.38 million in in-kind contributions

and funding to support Maryland's Greenhouse Gas Reduction Act (Md. Code,

Environment Article, §§2-1201 through 2-1211).  Specifically, for a price of one dollar,

Dominion would offer a perpetual license of its EDGE Energy Efficiency Program to five

listed Maryland electric distribution utilities, the license to include installation and start-

up user training, and, for each utility that adopted the program, Dominion would service,

maintain, and provide software updates at no cost for the first four years.  PPRP

estimated the aggregate value of the EDGE product licenses at $20.38 million ($9.28

million to BGE, $4.67 million to Pepco, $2.15 million to Delmarva, $1.8 million to

SMECO, and $2.48 million to Potomac Edison).[5]

---

[4] MEAP is a program administered by the Office of Home Energy Programs, a statutory unit within the Family Investment Administration of the Department of Human Services. The Office is authorized, among other things, to carry out an energy emergency crisis intervention program to prevent low income households from experiencing danger to health or survival due to imminent discontinuation of energy services by a utility vendor by making payments on behalf of qualified households to defray fuel and utility costs. *See* Md. Code, Human Resources Article §§5-5A-01 through 5-5A-08.

[5] For any utility that failed to execute a license agreement by January 1, 2017, Dominion would be required to execute a trust agreement or similar instrument in the amount equal to the allocate EDGE value for that utility, to be used to fund other greenhouse gas reduction projects determined by PSC.

In support of that Condition, PPRP pointed out that intervenors and the public had raised concerns about greenhouse gas emissions from the Project and its overall contribution to climate change. PPRP added:

> "The State of Maryland is particularly vulnerable to the threats associated with climate change, and is taking proactive steps to address these challenges through initiatives such as the Greenhouse Gas Reduction Act Plan, participation in the Regional Greenhouse Gas Initiative, and sound investments in energy efficiency, conservation, and renewable resources. Therefore, PPRP and its sister agencies continued to work with [Dominion] after the evidentiary hearings to explore mechanisms for support of Maryland's greenhouse gas reduction goals."

As noted, PSC found that Condition to be both insufficient and too speculative to provide offsetting economic benefits and replaced it with a $40 million contribution to SEIF.

Relying heavily on *Eastern Diversified v. Montgomery Cty.*, 319 Md. 45, 570 A.2d 850 (1990) (*Eastern Diversified*), AMP argues that the payments to State agencies mandated by Conditions J-3 and J-4 constitute a tax, which the General Assembly has not authorized PSC to impose, but without which the CPCN would not have been granted. PSC and Dominion both take issue with that argument. They maintain that the two Conditions are not primarily for the purpose of raising revenue, which is the hallmark of a tax, but constitute proper regulatory requirements designed to offset the negative economic impact of the Project that would occur without them. Dominion offers two additional rebuttals – that the Conditions are not taxes because Dominion has agreed,

13

voluntarily, to pay them, and that AMP has no standing to raise the argument in any event because **it** is not subject to the Conditions.

We shall dispose first of Dominion's standing argument. Dominion informs us that it has located no other Maryland case in which a third party was permitted to challenge the lawfulness of a putative tax that an unrelated entity was paying but that the complainant was not required to pay. The cases cited by AMP, Dominion argues, all involved an action challenging a tax to which the complaining party was subject.

Standing to bring an action for judicial review of an administrative agency's final decision is ordinarily a matter of statute. *Merchant v. State*, 448 Md. 75, 100, 136 A.3d 843, 858 (2016). In *Sugarloaf v. Dept. Of Environment*, 344 Md. 271, 287, 686 A.2d 605, 614 (1996), involving an action for judicial review under the State Administrative Procedure Act (Md. Code, State Government Article, §10-222(a)), the Court held that, in order to have standing under that statute, a person must be **both** a party to the administrative proceeding **and "**aggrieved" by the agency decision, because that is what the statute said. To be "aggrieved," we said, a person must ordinarily "have an interest 'such that he is personally and specifically affected in a way different from . . . the public generally.'" *Id.* Dominion extrapolates that principle into the argument that, as AMP is not subject to the payments required of Dominion (and only Dominion), it is not aggrieved by that requirement.

This action was not brought under the State Administrative Procedure Act. It was brought under PUA §3-202(a) – a statute peculiar to PSC that permits "a party or person

14

in interest [other than the Staff of the Commission] . . . that is dissatisfied by a final decision or order of the Commission [to] seek judicial review of the decision or order as provided in this subtitle." It does not require that the person be "aggrieved" but merely a party or person in interest who is "dissatisfied," a qualification that is met when the party "seeks judicial review, proffering reasons for the court to reverse the order or decision." *Mid-Atlantic v. Public Service*, 361 Md. 196, 204-06, 760 A.2d 1087, 1091-92 (2000). AMP satisfies the statutory test for standing. It was a party to the PSC proceeding, and it is certainly dissatisfied with the PSC Order.

The issue raised by AMP regarding the two Conditions – tax or regulation? -- has been before this Court a number of times, but we may start and end with *Eastern Diversified.* The question there was whether a development impact fee imposed by Montgomery County constituted a valid regulatory fee under the county's home rule power or a tax that the county had no authority to impose. Diversified desired to build an automobile sales and service facility. After its subdivision plat was approved, it filed an application for a building permit.

The application was approved subject to payment of a $118,000 impact fee. A local ordinance imposed such a fee on new development in two areas of the county to help finance the cost of road construction in those areas; it was payable as a condition to obtaining a building permit. The hearing examiner, the local Board of Appeals, and the Circuit Court rejected Eastern Diversified's challenge to the fee as an unlawful tax, on the ground that the fee was not a tax, in that it was not for general revenue purposes and

15

was not compulsory but only to help finance road improvements that directly benefitted the property sought to be developed. This Court, granting *certiorari* before any meaningful proceedings in the Court of Special Appeals, disagreed with that reasoning and reversed the Circuit Court judgment.

We started with the proposition that counties have no general taxing authority, but only that which has been granted by the State. Pursuant to the "Express Powers Act," however, Charter counties do have broad authority to enact ordinances not inconsistent with State law that "may aid in maintaining the peace, good government, health, and welfare of the county." *See* Md. Code, Local Government Article, §10-206(a).[6]

Building on several earlier decisions, we confirmed that there was a distinction between "the imposition of fees as a necessary part of a regulatory measure and the imposition of a tax for revenue purposes" but observed that (1) a regulatory measure may produce revenue and a revenue measure may provide for regulation, and (2) "[t]here is no set rule by which it can be determined in which category a particular Act [or in this case an administrative Order] primarily belongs." *Eastern Diversified*, 319 Md. at 52-53, 570 A.2d at 854. The best we could do was this:

> "In general, it may be said that when it appears from the Act itself that revenue is its main objective, and the amount of the tax supports that theory, the enactment is a revenue measure. 'In general. . . where the fee is imposed for purposes of regulation, and the statute requires compliance with certain conditions in addition to the payment of the prescribed sum, such sum is a license proper, imposed by

---

[6] As a result of Code Revision, the language of that statute has changed slightly, but not in substance, from that in place when *Eastern Diversified* was decided.

16

virtue of the police power, but where it is exacted solely for revenue purposes and its payment give[s] the right to carry on the business without any further conditions, it is a tax'" (quoting in part from 33 Am. Jur., Licenses, ¶ 19, p.340.

Applying those guidelines, the Court concluded that the impact fee was a tax. The revenue objective, we said, was evident in the statute. It was to raise money for county road construction. The fees were not based solely on the service provided to the property owner or to defray the expenses of the regulatory process. As the developer argued, there was no indication that the amount charged had any relevance or relationship to road construction made necessary by the particular development. Our conclusion was that the fee was exacted "solely for revenue purposes . . . to finance road construction which benefit the general public."

This case is far different. As a preface, the application for the CPCN was filed pursuant to both PUA §7-207 and §7-208, which deals with generating stations and associated transmission lines. Section 7-208(f)(1) requires PSC to include in its CPCN the requirements of Federal and State environmental laws and standards identified by the Department of Environment **and** "the methods and conditions that the Commission determines are appropriate to comply with those environmental laws and standards."

Apart from any general incidental authority PSC may have to attach conditions to approvals, §7-208(f)(1) requires PSC to attach conditions it finds appropriate, which necessarily may include conditions that may call for payments of one kind or another to governmental agencies, at least to the extent that they do not otherwise partake of a tax.

17

Unlike the ordinance in *Eastern Diversified*, which we concluded on its face was a revenue measure, the authority conferred in PUA §7-208(f)(1) is unambiguously regulatory in nature.

The payments required by Conditions J-3 and J-4 are not general exactions on all applicants for a CPCN to construct an electric generating station. They were not for the primary purpose of raising revenue, as there was no evidence that any of the recipients were in need of additional revenue. In determining whether to grant a CPCN, PSC was required by law to consider and weigh any positive economic or environmental impact against any negative impact – a purely regulatory matter. The Conditions were particular to that end – to offset the prospect of an increase in natural gas prices in the future due to the exporting of LNG by Dominion from the Cove Point facility by a contribution to MEAP, to help low-income families who would be specially affected by such an increase, and to offset the impact of the emission of pollutants from the fossil-fueled electric generating station by contributions to the State's greenhouse gas reduction programs. Accordingly, we hold that the exactions imposed by the two Conditions were primarily regulatory rather than revenue measures and did not constitute taxes. In light of that conclusion, we need not address whether compliance with those exactions was voluntary. Nor need we address Dominion's argument that, though clearly aware of the two Conditions, AMP never raised the issue of whether they amounted to unlawful taxes before PSC.

## FAILURE TO IDENTIFY VALUE OF POSITIVE FACTOR

PUA §3-113 requires, in relevant part, that a PSC decision and order (1) be based on consideration of the record, (2) be in writing, and (3) state the grounds for the conclusions of the Commission. The Order in this case complied with those requirements. It made extensive references to the record; it based its conclusion on what was in the record; it was in writing; and it stated the basis for the conclusions reached.

One of the things PSC was required to consider was whether and to what extent the economic benefit of the electric generating station would offset any negative economic impact from the station. AMP complains that PSC failed to state any finding in that regard – that, although it did assign some value to positive economic benefit, it did not state "what value, or range of values" it assigned to the positive effects.

In what would seem, at worst, to be an alleged failure by PSC to make a statutorily-required finding, AMP complains that it was denied due process because, by failing to state the value of the positive economic impact it assigned to the generating station, PSC "made it impossible to effectively challenge how the [statutory] balancing test was implemented."

AMP does not tell us, and we do not understand, how any imprecision in a required finding, if there was one, prevented AMP from challenging the PSC decision, much less how it has been denied due process of law. It is true, as this Court held in *Blue Bird Cab v. Dep't Emp. Sec.*, 251 Md. 458, 466, 248 A.2d 331, 335(1968) and later in *Overpak v. Baltimore*, 395 Md. 16, 40, 909 A.2d 235, 249 (2006) that "a fundamental

19

requirement of due process of law in a quasi-judicial proceeding is the right of the parties to be apprised of the facts relied on by the tribunal in its decision," but we think that occurred here.

As we have observed, given the unusual (though not unprecedented) nature of the Project, with the generating station to be used solely to support the exporting phase of the entire LNG facility, it was difficult for the parties (other than AMP, which contended that there was **no** economic benefit from the generating station because it was not to be connected to the grid) and for PSC to isolate entirely the economic benefit of the generating station from the economic benefit of the Project as a whole. There was evidence of some increased employment, both during the construction of the station and later from its operation and some additional taxes based on the value of the station, once constructed, and PSC, though regarding it as minimal, took that into account.

In its Order, PSC recounted the conclusions of the major participants regarding the positive and negative economic impacts, including rough estimates in dollars of the positive economic impact, which is all that it had. It was enough to find that, absent Conditions J-3 and J-4, the positive impact was insufficient to offset the negative impact but that, with those Conditions, totaling $48 million, the positive and negative impacts would be sufficiently in balance. It is a fair inference that, in concluding that, absent those Conditions, the net negative economic impact would not justify the granting of a CPCN, PSC estimated that the positive economic impact, absent those conditions, would be approximately $48 million less than the value of the negative economic impact, which

20

is within the range estimated by the parties in their submissions. We fail to see how AMP was hindered in challenging the PSC Order.

## SUFFICIENCY OF EVIDENCE

Finally, AMP complains that the evidence of the separate economic impact of the electric generating station was legally insufficient for PSC to draw any conclusion regarding that factor. AMP acknowledges that there was a good bit of evidence regarding the economic impact of the Project as a whole, but very little regarding the generating station itself.

This argument implicates the problem noted above -- the difficulty in isolating and estimating the overall economic impact of just the electric generating station when its sole function was to support the larger Project. There was evidence, which was disputed, regarding the economic benefit that would accrue from the employment of people to build and operate the station and from property taxes that would accrue to Calvert County under the PILOT agreement. It is not clear whether there was any evidence of whether Dominion could have proceeded with the export operation without building the generating station – *i.e.*, draw the needed electricity from the grid – or, if so, what the positive and negative effects of that might have been compared to those arising from building the generating station. There is no reference by any of the parties to any such evidence in the record.

21

PSC was faced with a dilemma. Dominion and PPRP stated that they produced all the evidence they could produce of the positive economic benefit of just the generating station. Neither PSC nor AMP has suggested what further evidence could have been produced. PSC was certainly aware that a decision by FERC was pending, and, in fact, according to its website (https://ferc.gov/media/news-releases/2014/2014-3/09-29-14.asp), FERC authorized construction of the Cove Point LNG Export Project (Docket No. CP13-113-000) on September 29, 2014.

It is clear from the submissions of PPRP and Dominion that the favorable economic impact of the entire Project would have been far greater in terms of employment and taxes than the impact of just the generating station, and PSC had to consider whether taking the strict view espoused by AMP, as opposed to accepting the evidence that PPRP and Dominion said was all they were able to produce, would have the effect of scuttling a Project that FERC might approve (and did approve) that could produce significant economic benefit to the State and county.

AMP insists that PSC should have denied the CPCN, not because of anyone's failure to produce additional evidence that **could** have been produced but because of the failure to produce evidence that the parties concluded, and PSC reluctantly accepted, could **not** have been produced due to the integration of the generating station into the overall Project. We again note PPRP's statement that, due to that intertwining, "many of the impacts from constructing and operating the electric generating equipment cannot be separated from the larger project and, thus, cannot be evaluated on a stand-alone basis." .

22

PSC recognized that the evidence regarding just the impact from the generating station alone was less than what it would have liked but dealt with what it had, which was all it was going to get. It did not ignore the statutory requirement to consider economic impact. It concluded that the evidence that it had sufficed to require the imposition of Conditions J-3 and J-4 and, with those Conditions, to warrant the granting of the CPCN. Under the circumstances, that decision was not an unreasonable one. It was one that fell within the discretion of PSC, guided by its expertise, to make, and we shall defer to it.

> JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED;
> PETITIONER TO PAY THE COSTS.