*Maryland Office of People's Counsel, et al.  v. Maryland Public Service Commission, et al.*
No.  15, September Term 2017


**Public Utilities – Public Service Commission – Acquisition of Electric Company – Consideration of Acquisition Premium.**  Under Maryland law, the Public Service Commission is charged with reviewing the proposed acquisition of an electric company in the State to ensure that the acquisition is "consistent with the public interest, convenience, and necessity, including benefits and no harm to consumers."  The Commission acted within its delegated discretion and was not arbitrary or capricious when it approved the acquisition of Pepco Holdings, Inc. and its utility subsidiaries by Exelon Corporation without finding that an "acquisition premium" paid by Exelon caused consumer harm or was inconsistent with the public interest.  Maryland Code, Public Utilities Article, §§3-203, 6-105(g).


**Public Utilities – Public Service Commission – Acquisition of Electric Company – Consideration of Effect on Alternative Generation Markets.**  Under Maryland law, the Public Service Commission is charged with reviewing the proposed acquisition of an electric company in the State to ensure that the acquisition is "consistent with the public interest, convenience, and necessity, including benefits and no harm to consumers."  The Commission acted within its delegated discretion and was not arbitrary or capricious when it approved the acquisition of Pepco Holdings, Inc. and its utility subsidiaries by Exelon Corporation and determined that alleged harm to renewables and distributed generation markets was speculative.  Maryland Code, Public Utilities Article, §§3-203, 6-105(g).

Circuit Court for Queen Anne's County
Case No. 17-C-15-019974
Argument: October 10, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 15

September Term, 2017

_____

MARYLAND OFFICE OF PEOPLE'S COUNSEL,
ET AL.

V.

MARYLAND PUBLIC SERVICE COMMISSION,
ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by McDonald, J.
Watts, J., dissents.

_____

Filed: August 29, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

The Maryland General Assembly has determined that an acquisition of a company that supplies electricity in the State, including a merger with another utility, should be reviewed by the administrative body with specialized knowledge of utility markets and energy generation and distribution – the Respondent Public Service Commission ("Commission"). The Commission must assess whether such a transaction is "consistent with the public interest, convenience, and necessity, including benefits and no harm to consumers." The Legislature has identified specific issues for the Commission to consider, and has also given the Commission discretion to examine other matters that the Commission may find pertinent to its assessment. After it has completed its analysis, the Commission is to either approve, reject, or set conditions for approval of the transaction.

The General Assembly has provided for judicial review of such decisions of the Commission, but that review is to be deferential to the Commission's expertise and findings. The role of the courts is to ensure that the Commission has exercised its discretion in carrying out this important responsibility within the bounds prescribed by the General Assembly and the Constitution.

This case concerns the Commission's approval of the acquisition of Respondent Pepco Holdings, Inc. ("PHI") and its utility subsidiaries by Respondent Exelon Corporation ("Exelon"). Petitioners, the Office of People's Counsel ("People's Counsel"), the Sierra Club, and Chesapeake Climate Action Network, have presented two questions concerning the merits of the Commission's decision. First, People's Counsel raises the question whether the Commission was required to regard an "acquisition premium" paid

by Exelon to PHI shareholders as part of the transaction as a harm to consumers or as inconsistent with the public interest. Second, all Petitioners question whether the Commission acted arbitrarily or capriciously in how it addressed alleged harms to the distributed generation and renewable energy markets.

The Circuit Court for Queen Anne's County and the Court of Special Appeals held that the Commission acted within its authority when it approved the transaction. We agree.

# I

## Background

### A.  *The Commission's Authority over Utility Mergers*

As a general rule, one must obtain prior authorization from the Commission to acquire control of an electric company[1] – a species of "public service company" under Maryland law[2] – that operates in the State. Maryland Code, Public Utilities Article ("PU"), §6-105(e). To obtain that authorization, the acquirer is to submit an application to the Commission containing detailed information about the transaction and providing certain documentation. PU §6-105(f).

The Commission is to "examine and investigate" the application and to conduct any necessary administrative proceedings for review of the application. PU §6-105(g)(1). The applicant has the burden of persuading the Commission that the acquisition is "consistent

---

[1] An "electric company includes, with certain exceptions not pertinent here, a company that "physically transmits or distributes electricity in the State to a retail electric customer." PU §1-101(h).

[2] PU §1-101(x).

with the public interest, convenience, and necessity, including benefits and no harm to consumers." PU §6-105(g)(3), (5). In connection with its review, the Commission is to consider the following factors:

(i)     the potential impact of the acquisition on rates and charges paid by customers and on the services and conditions of operation of the public service company;

(ii)    the potential impact of the acquisition on continuing investment needs for the maintenance of utility services, plant, and related infrastructure;

(iii)   the proposed capital structure that will result from the acquisition, including allocation of earnings from the public service company;

(iv)    the potential effects on employment by the public service company;

(v)     the projected allocation of any savings that are expected to the public service company between stockholders and rate payers;

(vi)    issues of reliability, quality of service, and quality of customer service;

(vii)   the potential impact of the acquisition on community investment;

(viii)  affiliate and cross-subsidization issues;

(ix)    the use or pledge of utility assets for the benefit of an affiliate;

(x)     jurisdictional and choice-of-law issues;

(xi)    whether it is necessary to revise the Commission's ring fencing and code of conduct regulations in light of the acquisition; and

(xii)   any other issues the Commission considers relevant to the assessment of acquisition in relation to the public interest, convenience, and necessity.

PU §6-105(g)(2).

3

At the conclusion of any proceedings, the Commission is to issue a written decision that is based on its consideration of the record of the proceedings and that states the grounds for the conclusions it has reached. PU §3-113(a). If the Commission finds that the applicant has borne its burden, the Commission is to issue an order granting the application. PU §6-105(g)(3)(i). The Commission may condition its approval of a transaction. PU §6-105(g)(3)(ii). If the Commission finds that the burden is not met, it is to issue an order denying the application. PU §6-105(g)(4).

## B.    *The Transaction*

### 1.    The Companies

Exelon is a utility services holding company incorporated in Pennsylvania and headquartered in Chicago, Illinois. Its principal subsidiaries before the merger at issue in this case were Baltimore Gas & Electric ("BGE"), a Maryland public utility; PECO Energy Company, a Pennsylvania public utility; Commonwealth Edison Company, an Illinois public utility; and Exelon Generation Company, LLC ("Exelon Generation"). Together, the three utility subsidiaries provide electricity service to 6.6 million customers, of whom about 1.2 million are in Maryland. They also provide natural gas distribution service to more than 1 million customers, of whom about half are in Maryland. Exelon Generation operates Exelon's generation business, including its generation fleet and Constellation, its wholesale energy marketing and competitive retail sales business. Many of Exelon's generation assets rely on nuclear power.

PHI is a utility services holding company incorporated in Delaware and headquartered in Washington, D.C.[3] PHI owns three public utilities – Potomac Electric Power Company ("Pepco"), Delmarva Power & Light Company ("Delmarva"), and Atlantic City Electric Company ("ACE"). Pepco delivers electricity to customers in Montgomery County and Prince George's County, as well as the District of Columbia. Delmarva delivers electricity to the Eastern Shore of Maryland and Delaware.[4] ACE delivers electricity in New Jersey, but not in Maryland. Together, the three utility subsidiaries of PHI provide electricity service to about 1.8 million customers, of whom about 1.3 million are in Maryland.[5]

2.      The Merger Proposal

On August 19, 2014, Exelon and PHI submitted to the Commission an application for approval of a proposed merger between the companies. Exelon proposed acquiring PHI in a cash-for-stock transaction for $27.25 per share – a total of $6.8 billion. The purchase price exceeded PHI's book value at that time ($3.1 billion) as well as its average market capitalization during the prior year ($5 billion based on an average stock price of

---

[3] In connection with the transaction, PHI has changed its name and form of business organization and is now known as Pepco Holdings, LLC.

[4] Delmarva also distributes natural gas to about 126,000 customers living in Delaware.

[5] The subsidiaries of PHI that provide electric service in Maryland – Pepco and Delmarva – are also Respondents in this appeal.

$19.94). After the merger, Exelon would provide electricity service to more than 80 percent of Maryland customers through its subsidiaries.

3.      Commission Consideration of the Merger Proposal

More than 25 parties, including the Sierra Club and Chesapeake Climate Action Network,[6] Montgomery County, and Prince George's County, the two counties where the majority of PHI customers reside,[7] petitioned to intervene in the Commission proceedings concerning the merger application. Other participants in the proceedings included People's Counsel and the Commission's Technical Staff ("Staff").

Beginning in January 2015, the Commission held five hearings to receive public comment and an initial 12 days of evidentiary hearings. The intervenors cited many potential issues with the merger. We will not attempt to list them all, but will focus on those germane to this appeal. According to some of the intervenors, Exelon's nuclear power assets posed financial risks due to safety concerns, and also created a conflict of interest with respect to other types of energy production. This conflict existed with respect to specific alternative sources of energy, such as solar or wind, as well as with respect to the method by which energy is delivered to consumers (*i.e.*, distributed generation vs. wholesale markets). Another significant issue to those opposing the merger was market

---

[6] The Sierra Club and Chesapeake Climate Action Network have filed joint briefs and are represented by the same counsel. For ease of reference, we shall refer to them collectively as "the Sierra Club" in this opinion.

[7] The concerns of both Montgomery County and Prince George's County were apparently resolved during the course of the administrative proceeding and they appear as Respondents supporting the position of the Commission and Exelon in this Court.

consolidation. There was concern that, if Exelon gained control over 80 percent of the Maryland market through multiple affiliates, public policy might be disproportionately shaped by Exelon's interests as a vertically integrated electricity company. Some intervenors preferred that PHI remain a company that had no affiliation with generation assets. It was important to those parties that regulators be able to compare a "wires only" company with a company associated with energy generation that might prefer a high price for electricity. Several parties also raised concerns over the price Exelon offered to pay to acquire PHI – the acquisition premium – describing it as a "windfall" to PHI's shareholders.

During the proceedings, Exelon amended its merger proposal to reflect commitments reached in two settlement agreements with most of the intervenors, including The Alliance for Solar Choice, and Montgomery County and Prince George's County. The Commission held five additional days of hearings in April 2015 to consider the settlements.

After considering the oral and written testimony along with other evidence, the Commission approved the application, subject to conditions, by a three to two vote. On May 15, 2015, the Commission issued an 86-page order explaining its decision, together with a 48-page appendix setting forth the conditions for approval of the transaction ("PSC Order"). The two dissenting members issued a 52-page dissenting opinion ("PSC Dissent"). *In the Matter of the Merger of Exelon Corporation and Pepco Holdings, Inc.*, Case No. 9361, Order No. 86990, 2015 WL 5566183 (May 15, 2015).

The Commission found that, contrary to the objections of some intervenors, the merger would not diminish the Commission's regulatory authority, would not create

7

disincentives to distributed and renewable energy sources, and would not cause an increase in rates. The Commission concluded that, when subject to the conditions set forth in the Commission order, the merger was "consistent with the broader public interest [and] will bring specific and measurable benefits and no harm" to Maryland consumers, including increased service reliability and lower rates (compared to what rates would be without the merger). PSC Order at 2. The Commission premised its approval of the acquisition on various conditions including, among other things: "ring-fencing," local control, and affiliate protections to ensure that PHI utilities' assets are protected from risks incurred by Exelon's generation business; a one-time $100 consumer rate credit totaling $66 million; an investment of $43 million in energy efficiency programs; a payment of $14.4 million to Green Sustainability Funds for Montgomery and Prince George's counties; a $4 million investment in workforce development programs; and construction of renewable energy facilities. PSC Order at A-1 – A-48. The Commission also retained the right to order Exelon to divest itself of assets and operations of Delmarva and Pepco in Maryland under specified circumstances. PSC Order at 49, A-37 – A-38. The dissenting Commissioners disagreed, citing many of the alleged harms described by intervenors.

4.      Judicial Review of the Commission Decision

In June 2015, several intervenors who had opposed the merger before the Commission and had not entered into one of the settlements sought judicial review of the Commission's decision in the Circuit Court for Queen Anne's County. On January 8, 2016, the Circuit Court issued an opinion affirming the final decision of the Commission. The Circuit Court declined to stay the transaction.

8

People's Counsel and the Sierra Club noted appeals to the Court of Special Appeals, but did not seek a stay to prevent the merger from closing. In the meantime, following the District of Columbia Public Service Commission's approval of the merger, the transaction closed in March 2016.

On January 27, 2017, the Court of Special Appeals affirmed the decision of the Circuit Court in an unreported decision. 2017 WL 382886 (2017). People's Counsel and the Sierra Club filed petitions for *certiorari*, which we granted. The Commission, Exelon and its subsidiaries, as well as Montgomery and Prince George's counties, have appeared as Respondents.

The Petitioners have posed two questions, which we rephrase as follows:

(1) Did the Commission err as a matter of law, or act arbitrarily or capriciously, when it failed to consider the acquisition premium Exelon paid to PHI shareholders as inconsistent with the public interest or as a harm to consumers?

(2) Was the Commission's assessment of the alleged harms to the renewable and distributed generation markets arbitrary or capricious?

## II

### Discussion

*A.*   *Standard of Review*

1. Review of a Commission Decision

In an appeal from judicial review of an agency decision, we review the agency's decision rather than the decision of the Circuit Court or of the Court of Special Appeals. *Accokeek, Mattawoman, Piscataway Creeks Community Council, Inc. v. Public Service*

*Commission*, 451 Md. 1, 11 (2016). Accordingly, we review directly the Commission's decision and apply the same standard of review as those courts did.

2. General Standard of Review for Commission Decisions

There is a statute that sets forth the standard for judicial review of Commission actions. It provides:

> Every final decision, order, or regulation of the Commission is prima facie correct and shall be affirmed unless clearly shown to be:
>
> (1) unconstitutional;
>
> (2) outside the statutory authority or jurisdiction of the Commission;
>
> (3) made on unlawful procedure;
>
> (4) arbitrary or capricious;
>
> (5) affected by other error of law; or
>
> (6) if the subject of review is an order entered in a contested proceeding after a hearing, unsupported by substantial evidence on the record considered as a whole.

PU §3-203. Thus, the standard of review does not depend on whether we would reach the same conclusions as the Commission, but on whether the Commission's decision or process is infected by the specified defects. In this case, Petitioners do not contend that the Commission's decision was unconstitutional, outside of its statutory authority or jurisdiction, or made as a result of an unlawful procedure. Rather, they contend that the Commission decision is legally erroneous and arbitrary or capricious in specific respects.

It has often been said that the standard of review of Commission decisions is "consistent with the standard of review applicable to all administrative agencies." *E.g.,*

10

*Office of People's Counsel v. Public Service Commission*, 355 Md. 1, 15 (1999); *Town of Easton v. Public Service Commission*, 379 Md. 21, 31 (2003). The standard of review set forth in PU §3-203 is certainly consistent with that applied to other administrative agencies under Maryland Administrative Procedure Act ("APA"), which does not apply to the Commission. In particular, the specified bases for reversing a Commission decision are the same as set forth for reversing an agency decision in the provision for judicial review in the APA. *See* Maryland Code, State Government Article, §§10-203(a)(3)(v), 10-222(h).

However, PU §3-203 also appears to be a more deferential standard in some respects compared to the standard of review under the APA. In particular, with respect to decisions of the Commission, the General Assembly has directed that the Commission's decision is "*prima facie* correct" and is to be affirmed unless the listed defects are "clearly shown." That language is absent from the APA's provision concerning judicial review. The distinction does not appear to be unintended. The statute establishing the Commission preceded the APA and the APA provision concerning judicial review was enacted just two years after enactment of the current version of the judicial review provision in the Commission's statute.[8]    *See Mid-Atlantic Power Supply Ass'n v. Public Service*

---

[8] When the Commission was originally created more than a century ago, the General Assembly provided that, in court proceedings arising out of decisions of the Commission, "the burden of proof shall be upon the party adverse to the … Commission, to show by clear and satisfactory evidence that the … order of the Commission … is unreasonable or unlawful …." Chapter 180, §46, Laws of Maryland 1910. That provision was carried forward in subsequent iterations of the law governing the Commission. *See* 1939 Maryland Code, Article 23, §420; 1951 Maryland Code, Article 78, §78.

The current language of the judicial review provision first appeared in the 1955 revision of the law governing the Commission. Chapter 441, Laws of Maryland 1955. In

11

*Commission*, 361 Md. 196, 214 (2000). ("Had the Legislature intended that the standard for judicial review of … Commission proceedings be the same as … under the APA, it is inconceivable that it would have excluded the … Commission from the APA").

In giving meaning to this language in PU §3-203 without rendering it surplusage,[9] we believe that it calls for a court to be particularly mindful of the deference owed to the Commission on those issues on which courts typically accord some degree of deference to administrative agencies – *i.e.* findings of fact,[10] mixed questions of law and fact,[11] and the

---

1998, it was recodified as part of what is now the Public Utilities Article without substantive change. Chapter 8, Laws of Maryland 1998.

The State Administrative Procedure Act was first enacted in 1957. Chapter 94, Laws of Maryland 1957.

[9] *Mid-Atlantic Power Supply Ass'n v. Public Service Commission*, 361 Md. at 215 ("statutes are to be read to give meaning to every word used and to do otherwise contravenes this cardinal rule of statutory construction"); *GEICO v. Insurance Commissioner*, 332 Md. 124, 132 (1993) (a statute should not be read "to render … any portion of it meaningless, surplusage, superfluous or nugatory").

[10] *Town of Easton,* 379 Md. at 30 ("a decision of the Commission ... will not be disturbed on the basis of a factual question except upon clear and satisfactory evidence that it was unlawful and unreasonable"); *Communication Workers of America v. Public Service Commission*, 424 Md. 418, 411 (2012) ("Because the Commission is well informed by its own expertise and specialized staff, a court reviewing a factual matter will not substitute its own judgment on review of a fairly debatable matter.") (citation omitted).

[11] *Office of People's Counsel*, 355 Md. at 14 (referring to the more deferential standard applied to "mixed questions of law and fact"). *Chesapeake & Potomac Telephone Co. of Maryland v. Public Service Commission*, 230 Md. 395, 411 (1963) (noting that, even when the Commission's factual findings "leave much to be desired," affirmance of its decision is appropriate when "the path which it followed can be discerned") (quoting *Baltimore Transit Company v. Public Service Commission*, 206 Md. 533, 545 (1955)).

construction of particular statutes administered, and regulations adopted, by the agency.[12]

On those questions on which a court does not typically defer to an agency – general questions of law, jurisdiction and constitutionality – PU §3-203 requires no greater deference to the Commission than any other agency. Such legal questions "are completely subject to review by courts."[13] In sum, with respect to the Commission, "this Court has tended to accord particular deference (though not total deference) to PSC decisions." *Accokeek, Mattawoman, Piscataway Creeks Community Council, Inc.,* 451 Md. at 12; *see also Baltimore Gas & Elec. Co.,* 305 Md. at 170 (recognizing that this Court has "consistently held that Commission orders enjoy a high degree of judicial deference on review") (citations omitted).

## B. *Whether the Commission Should Have Concluded that the Acquisition Premium Was a Consumer Harm or Was Inconsistent with the Public Interest*

The initial issue, raised by People's Counsel alone, concerns the price Exelon paid PHI shareholders to purchase their shares and obtain control of PHI. It is undisputed that Exelon paid a premium to acquire PHI – referred to the "acquisition premium" – but there is disagreement to some extent on the amount of the acquisition premium and, in any event,

---

[12] *Baltimore Gas & Electric Co. v. Public Service Commission*, 305 Md. 145, 161-62 (1986) (contemporaneous interpretation of statute by agency charged with its administration entitled to "great deference"); *Communication Workers of America,* 424 Md. at 434 (although not dispositive, agency's interpretation of statute entitled to "some deference").

[13] *Communications Workers of America,* 424 Md. at 433-34; *Town of Easton*, 379 Md. at 30.

whether the acquisition premium is significant for purposes of the Commission's review under PU §6-105. People's Counsel argues that the acquisition premium was a harm to consumers and was inconsistent with the public interest.

1.      Defining the Acquisition Premium

As the label implies, the purpose of paying an acquisition premium – sometimes called a "control" or "takeover" premium – is to acquire control of a company. The price paid to PHI shareholders, including the acquisition premium, reflects what Exelon thought was necessary for PHI management and shareholders to approve Exelon's offer to purchase the company. The purchase price here included a premium because it exceeded the company's market valuation prior to the announcement of the transaction.[14]

Such premiums are typical in any acquisition of a publicly traded company. *See* Lynn A. Stout, *Are Takeover Premiums Really Premiums? Market Price, Fair Value, and Corporate Law*, 99 Yale L.J. 1235, 1259-60, 1264-67 (1990). At any given market price for a share of stock, there will be shareholders who do not wish to sell because they place a greater value on the stock than the current market clearing price. That category of shareholder, and the value they place on their shares, is likely to grow if word gets out that someone wishes to buy all shares to take control of the company. Thus, if Exelon had attempted to purchase a controlling interest at the market price on the open market, it would

---

[14] People's Counsel would also compute the premium as the excess of the purchase price over book value of PHI and makes references to both measures of the acquisition premium in its briefs. Ultimately, People's Counsel argues that it is unnecessary to pick one or the other to resolve this case.

have driven the market price higher, encouraging some shareholders to "hold out" for even higher prices. Recognizing this dynamic, an acquirer may bring its proposed premium directly to the acquired company's board to avoid the time, expense, and uncertainty of attempting to acquire a company one share at a time. There is thus always likely to be an "acquisition premium" above the market clearing price when an acquirer seeks to take control of a company by purchasing its shares.

The purchaser's willingness to pay the acquisition premium presumably depends on the benefits it anticipates from the acquisition. In a merger situation, such benefits are often referred to as "synergies" resulting from the combination of the separate entities. It may also be the case that, when the company being acquired holds a monopoly position and the acquisition may enhance the monopoly position of that company or of the acquirer, part of the premium may represent the value of the enhanced monopoly position. In the case of a utility, a regulated monopoly, the company's monopoly position is partly the result of the company's franchise – an aspect of the business imbued with the public interest, as public policy otherwise discourages enhancement of monopoly status. *See* Maryland Code, Commercial Law Article, §11-201 *et seq*. (Maryland Antitrust Act).

2.      The Applicable Standard of Review for this Issue

An initial question is the standard of review. People's Counsel argues that the Commission erred as a matter of law in failing to consider the acquisition premium as a harm to consumers or as inconsistent with the public interest. In framing the question in that way, People's Counsel is urging that we apply the least deferential standard of review to the Commission's decision. However, it has also argued that the Commission's "failure

15

to make any findings whatsoever on the appropriate treatment of the [acquisition premium] renders its decision arbitrary or capricious" – a standard more deferential to the Commission.

In our view, the latter standard of review applies here. As explained above, the fact that the acquisition of an electric company is likely to involve payment of an acquisition premium to the departing shareholders is nothing new and hardly unexpected. *See Electric Public Utilities Co. v. West*, 154 Md. 445 (1928) (review of Commission decision concerning utility acquisition that involved premium). Yet the Legislature did not include it in the list of specific factors that the Commission is *required* to consider under PU §6-105(g)(2)(i)-(xi).

There is one reference to shareholders in the list of factors that the Legislature included in the statute: the Commission is to assess "the projected allocation of any savings that are expected to the public service company between stockholder and rate payers [.]" PU §6-105(g)(2)(v). This is a clear legislative command that the public interest requires an evaluation of the split of the anticipated benefits, presumably expressed in dollar terms, between consumers and shareholders of the resulting consolidated company. However, the funds that are to be allocated are the "savings that are expected to the public service company."

The acquisition premium is not itself "savings," nor is it "expected" (as the amount of the premium is already known at the time of the application). Furthermore, in the case of a cash-for-stock transaction, such as this one, the acquisition premium is not received by the acquired public service company, but is paid directly to the departing shareholders.

16

It appears that the Legislature was requiring the Commission to consider the allocation of merger synergies resulting from the transaction, not necessarily the acquisition premium paid to effect the transaction.[15]

This is not to say that the two concepts are unrelated. The acquirer may intend to recover any premium paid to departing shareholders from future savings generated by the consolidation. In that respect, the amount of the acquisition premium that the acquirer is willing to pay may depend in part on the proportion of the expected savings allocated to the consolidated entity.

In any event, the acquisition premium might also affect some of the other considerations listed in the statute. For example, a large premium could weaken the

---

[15] The Dissenting Opinion believes that PU §6-105(g)(2)(v) requires the Commission to consider the acquisition premium in terms of an allocation of benefits between ratepayers and shareholders of the company being acquired in the transaction (PHI) as opposed to the shareholders of the surviving company (Exelon). Dissenting slip op. at 5-6. It suggests that the Commission did so in a prior case – *In the Matter of the Merger of Exelon Corp. and Constellation Energy Corp.* 103 Md. PSC 22, 201 WL 833884, Case 9271, Order 84698 (February 17, 2012) ("PSC Constellation Order"). *See* Dissenting slip op. at 6-7.

It is certainly true that the Commission was aware of the acquisition premium in the prior case as the Commission referred to it – as well as to the fees paid to bankers, lawyers, accountants, and others – in the introductory portion of the order in that case. PSC Constellation Order at pp. 34-35. However, when the Commission analyzed the allocation of expected merger savings pursuant to PU §6-105(g)(2)(v) in that case, it did not refer to the acquisition premium but rather to the allocation of synergy savings. *See* PSC Constellation Order at pp. 90-91. It is also notable that, in doing so, the Commission referred to the allocation of expected savings between the ratepayers and shareholders who, because the acquisition resulted from a stock-for-stock transaction, became shareholders of the *surviving company* as a result of the transaction (unlike the PHI shareholders in the cash-for-stock transaction in this case).

proposed capital structure of the new entity, depending on how the acquisition is financed. It could also discourage future investments or encourage later cost-saving lay-offs to make up the expense. But these effects do not come from the acquisition premium alone. The acquisition premium is one of many facts that may apply to the statutory considerations. People's Counsel has not indicated how the Commission should have considered the acquisition premium as it would relate to the enumerated factors in the statute.

There is no indication in PU §6-105 that the Commission is *required* to consider the acquisition premium in its analysis. There is no other applicable law that requires the Commission to consider the acquisition premium. Of course, the final catch-all provision of the statute authorizes the Commission to consider "any other issues the Commission considers relevant …" and the acquisition premium could be such an issue. PU §6-105(g)(2)(xii).

In sum, while the absence of the acquisition premium from the list of factors in PU §6-105(g)(2) does not foreclose the Commission from exercising its discretion to consider the acquisition premium as part of its analysis, the Commission is not legally compelled to do so. In that context, the appropriate standard of review is whether the Commission was "arbitrary or capricious" in not considering the acquisition premium as a harm to consumers or as contrary to the public interest. PU §3-203(4).

This Court has characterized the arbitrary or capricious standard as similar to the standard under federal administrative law,[16] in that one challenging an agency decision

---

[16] *See Maryland Department of Environment v. Anacostia Riverkeeper*, 447 Md. 88, 121 n.40 (2016) (recognizing that deference under federal standard is comparable). The

18

must show that the agency exercised its discretion unreasonably or without a rational basis. *Harvey v. Marshall*, 389 Md. 243, 297-304 (2005). Whether an agency decision is arbitrary or capricious also depends, to some extent, on the degree of discretion that the Legislature has conferred on the particular agency with respect to the particular decision. *Communication Workers of America*, 424 Md. at 434 ("[W]hen an agency acts in its discretionary capacity, it is taking actions that are specific to its mandate and expertise and, unlike conclusions of law or findings of fact, have a non-judicial nature … [for which] we owe a higher level of deference.") (quotation marks and citation omitted). It is not a standard easily defined. *Harvey*, 389 Md. at 297. Courts may look for consistency with the policy goals stated in the pertinent statutes or regulations and with the agency's past decisions. *Id*. at 302-3. Because the standard is highly contextual, neither of these is a precise measuring stick. However, to the extent that the agency is expected to apply expertise to carry out its decision-making responsibility, courts will accord it greater leeway before labelling its exercise of that responsibility as arbitrary or capricious.

---

leading case defining the federal standard is *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). There, the Supreme Court identified several factors that could render an agency action arbitrary or capricious, including whether: (1) there is a rational connection between the facts found and the choice made; (2) the decision was based on a consideration of the relevant factors; (3) there has been a clear error of judgment; (4) the agency relied on factors which Congress has not intended it to consider; (5) the agency has entirely failed to consider an important aspect of the problem; (6) there is an explanation for a decision that runs counter to the evidence; and (7) the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. This standard is not an invitation for a court to second-guess an agency's judgment: "a decision of less than ideal clarity" will be upheld "if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974).

To overturn a Commission decision as arbitrary or capricious, a petitioner must overcome a very deferential standard to rebut the presumption that the Commission exercised its discretion properly. We apply this standard in assessing whether the Commission properly considered the factors listed in PU §6-105(g)(2) and exercised its discretion as to what weight to accord factors other than those specifically listed in the statute.

3.  Application in this Case

In its order in this case, the Commission noted that the ratio of the credits provided to ratepayers in connection with the transaction compared to the acquisition premium paid to the selling shareholders was within the range of such ratios in previous transactions approved by the Commission. PSC Order at 67. It also noted that Exelon had committed not to seek to recover the acquisition premium and its other transaction costs in the rates charged by its utility subsidiaries. *Id*. at 69. As one of the conditions for its approval of the transaction, the Commission required that Exelon adhere to that commitment. *Id*. at A-39. However, the Commission did not otherwise address the acquisition premium in its analysis of consumer harm or the public interest.[17]

The question then is whether the Commission was arbitrary or capricious in failing to treat the acquisition premium as a consumer harm or as inconsistent with the public

---

[17] The two dissenting members of the Commission argued that there was a "severe inequity" between the benefit of the merger to ratepayers compared to the benefit received by the departing PHI shareholders who were paid the acquisition premium and that it would be "appropriate for the Commission to consider and remedy" this inequity. PSC Dissent at D-43 – D-44.

interest. One possibility would be if the Commission deviated, without adequate explanation, from a long-standing practice of treating acquisition premiums as consumer harms. *See Frederick Classical Charter School, Inc. v. Frederick County Board of Education*, 454 Md. 330, 406-7 (2017) (agency cannot casually ignore prior policies and standards). However, as noted above, in its decision in this case, the Commission considered whether this premium was in line with acquisition premiums in previous applications and found that it was within that range. And, as in prior cases, it prohibited the acquiring company from recovering the acquisition premium from ratepayers. As far as we can tell, under those circumstances, the Commission has never considered the acquisition premium as a consumer harm. It was not unreasonable for the Commission to maintain a view consistent with its prior decisions.

Although a long-held view of an agency could be arbitrary or capricious if it is illogical, that is not the case here. It is difficult to see how consumers are *necessarily* worse off as a result of the payment of a premium, or would *necessarily* be better off if an acquiring company paid a smaller premium. While the acquiring company might have spent part of a premium for the benefit of consumers, it could also have simply issued a larger dividend to its own shareholders. Moreover, the same could be said for any of the other transaction costs involved in executing a merger, such as legal and accounting fees.

In an effort to relate the payment of the premium to consumer harm, People's Counsel analogizes this situation to cases where the sale of tangible property by a utility created a customer entitlement. It is true that ratepayers have an interest in the property of a utility in some circumstances. S*ee, e.g., Washington Gas Light Co. v. Public Service*

21

*Commission*, 450 A.2d 1187, 1238-39 (D.C.Ct.App. 1982) (excess propane sold at a profit); *Democratic Cent. Comm. of Dist. of Columbia v. Washington Metro. Area Transit Comm'n,* 485 F.2d 786, 808-11, 822 (D.C. Cir. 1973) ("*WMTC*"), *cert. denied*, 415 U.S. 935 (1974) (land that could no longer be used for the intended purpose).[18]  However, this is because the property either has been included in the rate base or would have been if the property were sold at a loss.  The Commission has adopted a similar approach in its own decisions.  *See, e.g.*, *In re Chesapeake & Potomac Tel. Co, of Md.*, 74 Md. PSC 595, 618, 1983 WL 911083, Case 7735, Order 66504 (December 30, 1983) (recognizing that because real property and taxes paid on it were part of the rate base, proceeds from sale should benefit ratepayers).  However, the Commission has not taken this approach with the sale of stock in a utility.  *See In the Matter of the Current and Future Financial Condition of Baltimore Gas and Electric Company*, 100 Md. PSC 348, 2009 WL 3817449, Case 9173, Order 82986 (October 30, 2009) (proposed cash-for-stock acquisition); *In the Matter of the Application FirstEnergy Corp. and Allegheny Energy Corp.*, 102 Md. PSC 11, 2011 WL 722020, Case 9233, Order 83788 (January 18, 2011) (proposed stock-for-stock merger); *In*

---

[18] Although land is not consumed in the course of providing utility service, the D.C. Circuit reached this result by analogizing depreciation with the related concepts of obsolescence and depletion.  The land at issue in that case had been incorporated into the rate base earlier, but was excluded after it could no longer serve its original purpose.  485 F.2d at 788-89.  Because ratepayers would have been responsible if the land were sold at a loss, "[e]lemental justice require[d]" ratepayers share in the proceeds even after being reimbursed what they had previously paid through fares.  *Id.* at 811 n. 227.  *Compare Boise Water Corp. v. Idaho Pub. Utilities Comm'n*, 578 P.2d 1089, 1092-93 (Idaho 1978) (distinguishing *WMTC* based on shareholders having provided the initial capital for the property in question while ratepayers did so in *WMTC*); *see also* P*hiladelphia Suburban Water Co. v. Pennsylvania Pub. Utility Comm'n*, 427 A.2d 1244, 1247-48 (Pa. 1981).

*the Matter of the Merger of Exelon Corp. and Constellation Energy Corp.* 103 Md. PSC 22, 2012 WL 833884, Case 9271, Order 84698 (February 17, 2012) (proposed stock-for-stock merger).

The Commission's approach is not unreasonable. Unlike tangible property owned by the utility, shares of stock represent an ownership interest in the utility. They are not depreciable assets because they do not have a finite useful life. They are not consumed in the course of providing utility service. Shares of utility stock are not part of the rate base and the risk and reward of a fluctuating stock price does not lie with the ratepayer. Indeed, one of the express conditions adopted by the Commission for approval of this merger is that recovery of the acquisition premium will not be included in the ratemaking structure – consistent with the Commission's approach in previous orders.

People's Counsel also argues that permitting the departing shareholders to receive the entire acquisition premium violates longstanding notions of the public interest. According to People's Counsel, although acquisition prices of non-regulated[19] businesses are primarily determined by market forces, the primary consideration here must be the public interest because that is the foundation of utility regulation.

It is true that the public interest is important to nearly everything a utility does. However, "the use of the words "public interest" in a regulatory statute is not a broad license to promote the general public welfare. Rather, the words take meaning from the

---

[19] This term is somewhat of a misnomer, as all businesses are subject to regulation in some form. Presumably, it is used to distinguish between heavily regulated businesses such as utilities and those with greater freedom to decide to refuse service or set prices.

purposes of the regulatory legislation." *NAACP v. Federal Power Commission*, 425 U.S. 662, 669 (1976). Although an acquisition of a public service company must be *consistent* with the public interest, it does not follow that public service companies cannot be market participants capable of entering into transactions involving stock. People's Counsel has provided no authority to the contrary.

This is not to suggest that an acquisition premium can *never* be considered by the Commission, either as a potential harm or as contrary to the public interest. The Legislature has authorized the Commission to consider "any other issues the Commission considers relevant to the assessment of acquisition in relation to the public interest, convenience, and necessity." PU §6-105(g)(2)(xii). In a particular case, the Commission may find that a premium is so large that it poses a potential harm to consumers. For example, the Commission could conceivably find that a very large premium is evidence that the acquirer could not carry out the acquisition without laying off essential employees, or has unrealistic expectations about future profits that risk consumer harm. In evaluating the credibility of executives of an acquired company who testify in favor of a transaction, the Commission could consider whether that testimony was influenced by any personal financial benefit that they would receive from the acquisition premium. But those are determinations for the Commission to make in its discretion under subparagraph (xii).

In sum, the Legislature has granted the Commission discretion to decide which issues, in addition to those specified in the statute, are relevant in determining whether a proposed merger or acquisition of a utility will harm consumers or be inconsistent with the public interest. In its order in this case, the Commission discussed the issue of the

24

acquisition premium generally and resolved it consistently with its prior decisions. That approach was not inconsistent with language of the statute that it was applying or with the policy underlying it. The Commission's limited discussion of the acquisition premium – and the condition it placed on Exelon's recovery of that payment – was not arbitrary or capricious. It was within the Commission's discretion to consider the issue to the degree it did.

**C.** **Whether the Commission was Arbitrary or Capricious in Evaluating Harm to Renewable and Distributed Generation Markets**

Both People's Counsel and the Sierra Club assert that the Commission was arbitrary or capricious in its assessment whether the merger would cause harm to consumers with regard to markets for alternative energy generation. In particular, they argue that Exelon has incentives to oppose technologies – such as renewable and distributed generation of electricity[20] – that could depress prices or challenge traditional power generation, while PHI as an independent utility did not have the same incentive. They conclude that the merger would therefore harm the markets for those technologies. In its decision, the Commission acknowledged these contentions, but found the prospect "that Exelon may

---

[20] Distributed generation refers to the generation of electricity by many small sources – for example, by consumers with rooftop solar panels – as opposed to a single hub like a power plant. Such technologies may compete with the traditional power generation in which existing utilities have invested. *See* James Rathz, *Nevada Rate Change Signals the Start of Larger Utilities Battle*, The Regulatory Review, (May 24, 2016) available at https://www.theregreview.org/2016/05/24/rathz-nevada-rate-change-signals-the-start-of-larger-utilities-battle/ (examining impact of falling costs of solar power and storage).

encourage BGE, Delmarva and Pepco to be resistant to other new grid developments, to be little more than speculation" that did not rise to the level of harm. PSC Order at 39 n.186.

As indicated earlier, the assessment whether an agency decision is arbitrary or capricious is a deferential standard in which a court may consider such things as the agency's expertise, policy goals stated in pertinent statutes or regulations, consistency with the agency's past decisions, and whether it is possible to follow the path of the agency's reasoning.

With respect to relevant policy goals, the General Assembly has recognized that "[g]lobal warming poses a serious threat to the State's future health, well-being, and prosperity[.]" Maryland Code, Environment Article ("EN"), §2-1201(2).[21] The State has implemented a number of programs to combat climate change. These include net metering,[22] renewable energy portfolio standards (RPS),[23] tax credits for renewable energy,[24] and markets for emissions allowances and renewable energy credits.[25] Renewable

---

[21] The General Assembly has created a Commission on Climate Change to advise the Governor and General Assembly on ways to mitigate the causes of climate change. EN §2-1301. The Department of the Environment is tasked with developing and finalizing plans to reduce greenhouse gas emissions. EN §2-1201 *et seq.*

[22] PU §7-306. Net-metering is a practice under which a utility charges a customer that produces its own power only for the net difference between energy consumed and energy produced by the customer. Whenever a customer produces more energy than it uses, the utility essentially buys the extra power from the customer.

[23] PU §7-701 *et seq.*

[24] Maryland Code, Tax–General Article, §10-720.

[25] EN §2-1002(g); PU §7-708.

energy, distributed generation, and related practices have the potential to advance Maryland environmental policy. The Commission properly considered these issues pursuant to the General Assembly's directive that it take into account the public interest in assessing an acquisition. In particular, in its order, the Commission found that Exelon's commitments to enhance certain interconnection protocols were consistent with the public interest. PSC Order at 78-80. It also found that renewable energy developments provided a benefit to all Maryland citizens, and were thus consistent with the public interest as well. *Id.*

According to People's Counsel and the Sierra Club, the Commission failed to adequately discuss the potential harm of the transaction to consumers with respect to alternative energy generation. However, the Commission's findings with respect to loss of voice, harm to the regulatory process, and related issues all relate to this issue as well. The Sierra Club urges us to see these as distinct theories, but it is not dispositive that the Commission made these findings in response to other alleged harms. These were presented as related potential harms, all premised on Exelon abusing its status as a vertically integrated electricity distribution monopoly. Although intervenors alleged multiple ways that such power could manifest as harm, each is based on the market power Exelon would obtain as a result of the transaction. The Commission was not required to repeat itself in its fact findings and analysis when a reasoning mind can readily grasp the connection between related issues.

It is indisputable that the Commission made fact findings that are applicable to this issue. Specifically, the Commission found that PHI had existing incentives comparable to

27

Exelon's to oppose disruptive technologies. PSC Order at 39-40. Indeed, the Commission noted that both Delmarva and Pepco recently acted on these incentives by seeking increased fixed charges for their customers. However, the Commission also found that Exelon would continue to comply with the Commission's orders and regulations, and that the merger would not limit the Commission's legal authority. *Id.* Nor would the transaction undermine the Commission's ability to exercise its "full regulatory powers" over utilities. Accordingly, the Commission concluded that "if there is a public policy area such as EmPOWER Maryland, distributed generation, or reliability and resiliency, where sufficient initiatives are not being proposed by BGE, Delmarva and Pepco, the Commission will be readily able to direct that such programs be proposed." *Id.* At 39.

These findings provide support the Commission's conclusion that harm to the renewable and distributed generation markets by virtue of the merger was speculative. These utilities have an incentive to preserve the status quo with or without the merger. That incentive cannot manifest as harm without the relevant policymakers' approval. The Commission found that PHI was acting on that incentive even though it did not own generation assets. The Commission also found that, although Exelon owns both generation and distribution assets, it was complying with regulations that constrain acting on that incentive. Regardless of whether the transaction was approved, the Commission would retain its authority and ability to regulate the parties in future proceedings.

In regulating entities that operate in a dynamic and changing economy, the Commission will be confronted from time to time with technological advancements that may radically transform the business of the regulated entity or the service it provides. The

28

Commission will have to make judgments as to how and when to put its thumb on the scale in steering such development consistent with the directions it receives from the Legislature. Nearly a century ago, in a ratemaking case, the Commission was asked to approve an increase in streetcar fares to counter the effect of a new technology – the automobile – on the revenues generated by streetcar ridership. The Commission declined to do so. This Court agreed that the Commission was not required to speculate on "extraordinary obsolescence," which the Court defined as "an extensive supersession of property used for the transmission or the generation of power, or instrumentalities used for the transportation of passengers." *West v. United Railways & Electric Co.*, 155 Md. 572, 605 (1928). The Court stated that such developments "can be considered by the Commission in light of actual facts and such allowance and adjustments made as may be proper under the circumstances." *Id.*

In the same way, it was not arbitrary or capricious for the Commission to decline to forecast future technological developments in the context of a merger application and to rely on its regulatory authority to prevent harms to these emerging technologies regardless of the existing and future incentives of Exelon and PHI to oppose such technologies.

# III

## Conclusion

Under PU §3-203, the decision of the Commission is treated as "prima facie correct," unless it can be "clearly shown" to suffer from one of several possible defects. We cannot say that such a showing has been made in this case and, accordingly, must reach the same conclusion as the Circuit Court and the Court of Special Appeals. We affirm the Commission's decision.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

Circuit Court for Queen Anne's County
Case No. 17-C-15-019974

Argued: October 10, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 15

September Term, 2017
_____

MARYLAND OFFICE OF PEOPLE'S
COUNSEL ET AL.

v.

MARYLAND PUBLIC SERVICE
COMMISSION ET AL.
_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.
_____

Dissenting Opinion by Watts, J.
_____

Filed: August 29, 2018

Respectfully, I dissent.  As President Franklin Delano Roosevelt stated: "The test of our progress is not whether we add more to the abundance of those who have much; it is whether we provide enough for those who have too little."  This case involves one utility company's acquisition of another, where the acquisition's total benefits to Maryland's ratepayers were measurable in millions of dollars, while the acquisition's benefits to the acquired utility company's stockholders exceeded a billion dollars.

I would hold that the Maryland Public Service Commission ("the Commission"), Respondent, erred as a matter of law in failing to expressly address whether it was consistent with the public interest for Maryland's ratepayers to receive benefits from Exelon Corporation ("Exelon")'s acquisition of Pepco Holdings, Inc. ("Pepco")[1] that were minimal compared to the $1.2 billion acquisition premium that Exelon paid Pepco's stockholders.[2]

---

[1]Pepco Holdings, Inc. owns multiple utility companies, including Delmarva Power & Light Company and Potomac Electric Power Company—which is also known as "Pepco."  To clarify, I will refer to Pepco Holdings, Inc. as "Pepco."

[2]An acquisition premium is the difference between the value of all of the to-be-acquired company's stock when an acquisition is announced, and the higher price—*i.e.*, the premium—that the acquiring company pays for all of the to-be-acquired company's stock.  See In the Matter of the Merger of Exelon Corp. and Constellation Energy Grp., Inc., 103 Md. P.S.C. 22 (2012) (The Commission stated that an acquisition "certainly [was] good for [the to-be-acquired company's stock]holders — they [would] be paid a substantial premium over the value of their shares at the time [that] the [acquisition] was announced." (Cleaned up)).  Here, the $1.2 billion acquisition premium was the approximate difference between the value of all of Pepco's stock on April 29, 2014, when the acquisition was announced (approximately $5.7 billion), and the higher price that Exelon paid for all of Pepco's stock (approximately $7 billion).

Before the Commission, as a witness for the Maryland Office of People's Counsel, Petitioner, a public utility rate consultant testified that the acquisition premium should have been considered to be $1.842 billion, because the $1.2 billion figure failed to account for (Continued...)

In its Order approving the acquisition, the Commission required Exelon to contribute $109.2 million toward a Customer Investment Fund, which would be comprised of $43.2 million for energy efficiency programs, and $66 million for a $100 rate credit for each of Pepco's residential ratepayers. The Commission observed that two stakeholders— namely, the Maryland Office of People's Counsel ("People's Counsel"), Petitioner, and the Maryland Energy Administration—contended that the $109.2 million Customer Investment Fund was insignificant compared to the $1.2 billion acquisition premium. The Commission reasoned that the ratio of the $109.2 million Customer Investment Fund to the $1.2 billion acquisition premium was within "the range of ratios on which [the Commission] ha[d] conditioned other mergers[.]" The Commission also rejected the idea that the $66 million in rate credits was insufficient in light of past mergers and the $1.2 billion acquisition premium, determining that the $66 million in rate credits, "when combined with other benefits in this case, appropriately balance[d] the allocation of short- and long-term benefits to ratepayers[.]"

A review of the Commission's Order reveals that, aside from noting that the ratio of the Customer Investment Fund to the acquisition premium was similar to such ratios in past cases, the Commission engaged in no analysis whatsoever as to the issue of whether the acquisition's benefits to ratepayers were sufficient in light of the $1.2 billion acquisition premium. In my view, the Commission was required, but failed, to expressly address

_____

the increase in the value of Pepco's stock while it and Exelon were negotiating the acquisition between January 28, 2014 and April 29, 2014. Because the acquisition premium's exact amount is not dispositive for purposes of the questions presented, I will assume that the acquisition premium was $1.2 billion.

- 2 -

whether it was consistent with the public interest for there to be such a large disparity between the acquisition's benefits to ratepayers and the $1.2 billion acquisition premium. I would reverse the Court of Special Appeals's judgment and remand with instructions to reverse the Circuit Court for Queen Anne's County's judgment, with instructions to vacate the Commission's Order and remand so that the Commission can expressly address whether it was consistent with the public interest for ratepayers to receive benefits that so minimally compared to the $1.2 billion acquisition premium.[3]

The relevant statute, Md. Code Ann., Pub. Util. (1998, 2010 Repl. Vol.) ("PU") § 6-105 (Acquisition of Electric Company or Gas Company), provides as follows. To acquire an electric company, a would-be acquiring company must file an application with the Commission. See PU § 6-105(e)(1), (f). The Commission must determine whether granting the application would be, among other things, "consistent with the public interest[.]" PU § 6-105(g)(3)(i), (g)(4). If the Commission does not find that granting the application would be consistent with the public interest, the Commission must deny the application. See PU § 6-105(g)(4). PU § 6-105(g)(2) sets forth factors that the Commission is required to consider, stating in pertinent part:

> The Commission shall consider the following factors in considering an acquisition under this section:
>
> * * *
>
> (v) the projected allocation of any savings that are expected to the public service company between stockholders and rate[]payers;

---

[3]I would not reach the second question presented, which pertains to the alleged "harm to the distributed generation and renewable energy markets resulting from Exelon's acquisition of" Pepco.

* * *

(xii) any other issues [that] the Commission considers relevant to the assessment of acquisition in relation to the public interest, convenience, and necessity.

Here, two of the Commission's five members dissented, stating that, under PU § 6-105(g)(2)(v) and (xii), "it [was] appropriate for the Commission to consider and remedy the hugely disparate allocation of benefits between" ratepayers and Pepco's stockholders. The dissenting members of the Commission explained:

> Assuming [that] the [acquisition] is consummated, [Pepco's stock]holders will receive a $1.2 billion [acquisition] premium. In contrast, ratepayers will receive approximately $66 million in rate credits[,] and $57 million in indirect energy efficiency programming funds [that are] directed toward county and utility programs. Even if we credit the alleged synergy savings[4] — $37 million for the first five years[,] and $17 million each following year — the ratepayer benefits are dwarfed by the [acquisition] premium. To put it another way, it would take ratepayers over sixty years of recouping $17 million per year in synerg[y savings] to match the value [that Pepco's stock]holders — mostly non-Marylanders — received from selling two Maryland utility franchises [— Delmarva Power & Light Company and Potomac Electric Power Company —] to the highest bidder.
>
> It is not consistent with the public interest for the vast majority of benefits of the "franchise" — that is, the exclusive right [that is] granted by the State to provide utility services to Maryland [ratepayer]s — to flow to [Pepco's] stockholders instead of ratepayers. **The [Commission] should have addressed this disparity[,] and either rejected the [acquisition] or lessened this inequity by providing additional benefits to ratepayers.**

(Emphasis added) (cleaned up).

---

[4]Synergy savings are reductions in operating costs that result from one utility company's acquisition of another, in that the "combined companies will operate better and more efficiently, and at considerable savings compared to the costs of operating separately." In the Matter of the Application of the Merger of FirstEnergy Corp. and Allegheny Energy, Inc., 102 Md. P.S.C. 11 (2011).

I agree with the dissenting members of the Commission, and would conclude that the Commission violated PU § 6-105(g)(2)(v) and (xii) by failing to expressly consider whether it was consistent with the public interest for ratepayers to receive benefits that were insignificant compared to the $1.2 billion acquisition premium. The issue of the disparity between the acquisition's benefits to ratepayers and the $1.2 billion acquisition premium was "relevant to the assessment of acquisition in relation to the public interest[.]" PU § 6-105(g)(2)(xii). Although it is up to the Commission to determine what is relevant to such an assessment, see id., it is evident that the Commission deemed the $1.2 billion acquisition premium relevant, given that the Commission mentioned the same twice when summarizing the stakeholders' contentions, as well as twice when explaining why it approved of the acquisition. In any event, it is clearly "relevant . . . to the public interest," id., where an acquiring company pays a substantial acquisition premium to an acquired utility company's stockholders, while contributing a comparatively small amount toward benefits to ratepayers.

I disagree with the Commission's contention that PU § 6-105(g)(2)(v) pertains only to synergy savings, and does not require the Commission to consider an acquisition premium. PU § 6-105(g)(2)(v) states that the Commission must consider "the projected allocation of any savings that are expected to the public service company between stockholders and rate[]payers[.]" The "public service company" at issue is the to-be-acquired public service company, and the "stockholders" at issue are those of that public service company. Obviously, once the acquiring company pays the stockholders an acquisition premium for their stock, the stockholders who are not ratepayers will not

- 5 -

benefit further from the acquisition in any way—whether through synergy savings or otherwise. In other words, the synergy savings do not matter to most, if not all, of the stockholders; the acquisition premium does. Accordingly, it would be nonsensical for PU § 6-105(g)(2)(v) to mean that the Commission must consider "the projected allocation of [synergy] savings . . . between stockholders and rate[]payers"—because the stockholders who are not ratepayers will not benefit from synergy savings at all. A commonsense reading of PU § 6-105(g)(2)(v) is that the Commission must consider "the projected allocation of any savings"—*i.e.*, funds—that the acquiring company provides to ratepayers on one hand, and the funds that the acquiring company provides to the to-be-acquired public service company's stockholders on the other hand.

Notably, in this case, the Majority is writing on a blank slate, in that this Court has never analyzed PU § 6-105 before. Although the Commission has applied PU § 6-105 in past acquisitions and the Commission's decisions are entitled to deference, the Commission's decisions do not bind any court. That said, In the Matter of the Merger of Exelon Corp. and Constellation Energy Grp., Inc., 103 Md. P.S.C. 22 (2012) is persuasive. Exelon, id., demonstrates that the Commission should have expressly addressed whether it was consistent with the public interest for ratepayers to receive benefits that were minimal compared to the $1.2 billion acquisition premium. In Exelon, id., the Commission determined that Exelon's acquisition of Constellation Energy Group ("Constellation")—

which, in turn, owned all of Baltimore Gas and Electric Company ("BGE")'s stock[5]—was consistent with the public interest. The Commission observed that Constellation's stockholders would "be paid a substantial premium over the value of their shares at the time the deal was announced." Exelon, 103 Md. P.S.C. 22 (cleaned up). The Commission posed the following question: "**[O]bviously[,] the [acquisition] is good for those who have a personal or professional financial interest in the deal, but is it consistent with the public interest?**" Id. (emphasis added). Significantly, in answering that question in the affirmative, the Commission considered the issue of "whether a $100 rate credit sufficiently benefit[ted] BGE residential [ratepayer]s **in light of the much higher payments [that were] received by . . . [Constellation's stock]holders.**" Id. (emphasis added). The Commission discussed the issue, and ultimately determined that it was not necessary to require a higher rate credit, given that Exelon had made "commitments to fund energy efficiency programs[.]" Id.

The Commission also addressed the matter of whether synergy savings would benefit ratepayers. Id. The Commission noted that synergy savings are "inherently

---

[5]In 1995, Constellation was formed with the intention that BGE and Potomac Electric Power Company would merge into it. See Exelon, 103 Md. P.S.C. 22. In 1997, however, BGE and Potomac Electric Power Company cancelled the merger because the Commission had ordered that, for the merger to proceed, Constellation would have needed to cut "electric rates by nearly $250 million over the next four years[,] and relinquish nearly $200 million more in power costs [that were then] passed on to" ratepayers. Kevin L. McQuaid, *BGE, [Potomac Electric Power Company] Abandon Merger[:] Regulatory Obstacles End Two-Year Quest*, The Baltimore Sun (Dec. 23, 1997), http://articles.baltimoresun.com/1997-12-23/news/1997357048_1_pepco-merger-bge [https://perma.cc/33W4-E8GK]. In or after 1999, Constellation became the holding company for BGE's stock. See Exelon, 103 Md. P.S.C. 22.
(Continued...)

speculative" and "too intangible to qualify as a benefit" to ratepayers under PU § 6-105. The Commission concluded that PU § 6-105 "require[d] that BGE ratepayers receive at least a portion of [synergy savings] **as immediately and certainly as Constellation's [stock]holders.**" Id. (emphasis added) (cleaned up). Accordingly, the Commission ordered Exelon to contribute toward a Customer Investment Fund an amount that was equal to half of the projected synergy savings. See id.[6]

Exelon, 103 Md. P.S.C. 22, indicates that, where an acquisition results in a substantial acquisition premium, the Commission must expressly address whether the acquisition's benefits to ratepayers are sufficient to be consistent with the public interest in light of the substantial acquisition premium. Here, the Commission failed to do so.

I am unpersuaded by In the Matter of the Proposed Merger of the Potomac Elec. Power Co. and Delmarva Power and Light Co., 93 Md. P.S.C. 134 (2002) and In the Matter

---

[6]Significantly, in a footnote in its discussion of synergy savings, the Commission stated that PU § 6-105(g)(2)(v) "explicitly requires that [the Commission] consider the allocation of **benefits** between ratepayers and [stock]holders." Exelon, 103 Md. P.S.C. at 22 n.357 (emphasis added). The Commission's use of the word "benefits," which generally has a broad meaning, supports the principle that PU § 6-105(g)(2)(v) does not merely require the Commission to consider synergy savings; instead, PU § 6-105(g)(2)(v) requires the Commission to consider all benefits to stockholders and ratepayers, including both synergy savings and funds that are invested for the ratepayers' sake. Indeed, in the paragraph in which the footnote appears, the Commission ordered Exelon to invest millions of dollars into a Customer Investment Fund. See id. at 22. Also, in the same paragraph, the Commission referred to the "benefits" that "Constellation's [stock]holders" would "immediately and certainly" receive—which was ostensibly a reference to, among other things, the acquisition premium that Exelon paid Constellation's stockholders. See id. Constellation was the to-be-acquired company, while Exelon was the acquiring company. See id. In short, in Exelon, id., as explained above, the Commission considered the synergy savings, as well as the allocation of benefits between ratepayers and Constellation's, the to-be-acquired company's, stockholders.

of the Merger of AltaGas Ltd. and WGL Holdings, Inc., ___ Md. P.S.C. ___, Case No. 9449, Order No. 88631, 2018 WL 1705968 (Apr. 4, 2018), which indicate that it is improper for the Commission to consider an acquisition premium. These decisions are inconsistent not only with Exelon, 103 Md. P.S.C. 22, in which the Commission expressly considered an acquisition premium, but also with PU § 6-105(g)(2)(v) and (xii), which, as discussed above, require the Commission to consider an acquisition premium.

In Potomac Elec. Power, 93 Md. P.S.C. 134, the Commission determined that Potomac Electric Power Company's acquisition of Delmarva Power & Light Company was consistent with the public interest. The Commission rejected a contention by an opponent of the acquisition that Potomac Electric Power Company had "failed to demonstrate that [the acquisition agreement] adequately insulate[d] ratepayers from financial risks [that were] associated with the substantial acquisition premium[.]" Id. The Commission reasoned that the "acquisition premium [was] a transfer of wealth between [stock]holders that ha[d] nothing to do with the cost of providing utility service." Id.

In AltaGas, 2018 WL 1705968 at *22, the Commission determined that AltaGas Ltd. ("AltaGas")'s acquisition of Washington Gas Light Company ("Washington Gas") was consistent with the public interest. The Commission observed that People's Counsel raised the same contention regarding an acquisition premium that it did in this case, stating:

> In the Exelon-[Pepco] merger proceeding, [People's Counsel] raised the novel theory that ratepayers should be entitled to a share of the acquisition premium [that was] paid by the acquiring company (Exelon[]) to purchase the regulated company (Potomac Electric Power Company[]). The Commission declined to accept [People's Counsel]'s arguments in that proceeding, and the [] Court of Special Appeals rejected [People's Counsel]'s arguments on appeal. In the present case, [People's Counsel] has

reiterated its arguments, claiming that the "extreme disparity between [stock]holder benefits flowing from the acquisition premium, and the rate credits to Washington Gas [ratepayer]s" is contrary to the public interest, which requires that AltaGas "make a payment equivalent to this amount to Washington[] Gas's Maryland [ratepayer]s[,] or to causes that will benefit the Maryland public." [A witness for People's Counsel] further argued that the merger "is a sale of public franchise for private gain" that necessitates a contribution to ratepayers. Finally, [People's Counsel] argued that the size of the acquisition premium puts financial stress on AltaGas that could cause harm to ratepayers.

Id. at *41 (cleaned up). The Commission rejected People's Counsel's contention regarding the acquisition premium, reasoning:

We again decline to accept [People's Counsel]'s arguments on this matter. Pursuant to PU[] § 6-105[(g)(2)], we are required to consider eleven specified factors in reviewing an acquisition. However, the acquisition premium is not an enumerated factor, indicating that the General Assembly did not intend that the Commission review the acquisition premium for reasonableness[,] or as a source of additional [ratepayer] benefits. Of course, [PU] § 6[-]105(g)(2)(xii) authorizes us to consider "any other issue[s that] the Commission considers relevant to the assessment of acquisition in relation to the public interest, convenience, and necessity." Nevertheless, we will not disturb our prior holding that the acquisition premium represents a negotiated, private transfer of funds between [stock]holders[,] and is not properly [a] source of funds to obtain further [ratepayer] benefits. This [acquisition] is not the sale of the franchise[—]the Washington Gas franchise remains where it always has been, with Washington Gas.

Id. These cases are not in accord with the Commission's analysis in Exelon, 103 Md. P.S.C. 22, and are inconsistent with PU § 6-105(g)(2)(v) and (xii).

The Commission's contentions in this case are similar to its reasoning in AltaGas, id. On brief, the Commission argues that PU § 6-105(g)(2) does not require it to consider an acquisition premium. At oral argument, the Commission's counsel disputed People's Counsel's assertion that Exelon's acquisition of Pepco constituted a sale of Pepco's franchises, stating: "[T]he franchise[s are] exactly where [they were] before this

- 10 -

[acquisition]. [A] franchise is with [Potomac Electric Power Company], and [a] franchise is with Delmarva [Power & Light Company]. . . . The franchise[s were] not sold to Exelon." On a related note, the Commission's counsel asserted that the $1.2 billion acquisition premium did not harm ratepayers because "the ratepayers don't own [Pepco's] franchise[s]."

I disagree with the Commission's interpretation of PU § 6-105(g)(2) in this case and in AltaGas, 2018 WL 1705968, at *41. The circumstance that PU § 6-105(g)(2) does not expressly mention acquisition premiums does not mean that the Commission may refrain from considering them. To the contrary, as discussed above, PU § 6-105(g)(2)(v) and (xii) require the Commission to consider acquisition premiums. I acknowledge that, as the Commission's counsel noted at oral argument, and as the Commission stated in AltaGas, id., an acquisition of a utility company does not constitute a sale of the acquired utility company's franchise. Additionally, the Commission's descriptions of acquisition premiums in AltaGas, id. (An "acquisition premium represents a negotiated, private transfer of funds between [stock]holders[.]") and Potomac Elec. Power, 93 Md. P.S.C. 134 (An "acquisition premium is a transfer of wealth between [stock]holders that has nothing to do with the cost of providing utility service.") are accurate.

These observations by the Commission, however, are beside the point because they ignore the Commission's obligation to consider the public interest under PU § 6-105(g)(2)(v) and (xii). An acquisition premium is not consistent with the public interest simply because it will not increase "the cost of providing utility service" or otherwise harm ratepayers, Potomac Elec. Power, id., or simply because the acquired utility company's

"franchise [will] remain[] where it always has been," <u>AltaGas</u>, 2018 WL 1705968, at *41. Where an acquisition results in a substantial acquisition premium, PU § 6-105(g)(2)(v) and (xii) require the Commission to determine whether it is consistent with the public interest for the acquiring company to pay so much to the acquired company's stockholders, while contributing so little toward benefits to ratepayers—for example, through a Customer Investment Fund. By way of illustration, in <u>Exelon</u>, 103 Md. P.S.C. 22, where Exelon sought to acquire Constellation, the Commission ordered Exelon to contribute toward a Consumer Investment Fund an amount that was equal to half of the projected synergy savings, so that ratepayers would "receive at least a portion of these benefits as immediately and certainly as Constellation's [stock]holders." (Cleaned up). Similarly, here, the Commission should have expressly addressed whether the disparity between the acquisition's benefits to Pepco's stockholders and the acquisition's benefits to ratepayers was consistent with the public interest, and possibly should have, as the dissenting members of the Commission aptly put it, "either rejected the [acquisition] or lessened this inequity by providing additional benefits to ratepayers."

At oral argument, the Commission's counsel quoted the following passage in <u>In the Matter of the Current and Future Fin. Condition of Balt. Gas and Elec. Co.</u>, 100 Md. P.S.C. 348 (2009), in which the Commission approved Constellation's sale of nearly half of Constellation Energy Nuclear Group, LLC to Electricite de France International, S.A. for $1 billion:

> We could, we suppose, look at the fact that [Constellation] will emerge from this [sale] with net proceeds on the order of one billion dollars after retiring debt[,] and divert a large portion of those proceeds to rate relief.

We will resist the temptation. [Constellation] is entitled to the fair proceeds of a properly conditioned [sale], and [PU] § 6-105 does not give us unbridled authority to restructure the deal or fundamentally alter its outcome.

Although Balt. Gas & Elec., id., involved a sale of less than half of a utility company rather than an outright acquisition of a utility company—and thus did not involve an acquisition premium—the Commission's position appears to be that, just as it declined to "divert a large portion of [] proceeds" of a sale "to rate relief" in Balt. Gas & Elec., id., the Commission did not order Exelon to divert funds from the $1.2 billion acquisition premium to rate credits in this case. To the extent that the Commission takes that position, it is a red herring. The question is not whether the Commission had the authority to order Exelon to lower the amount of the $1.2 billion acquisition premium. The question is whether it was consistent with the public interest for Exelon to contribute only $109.2 million toward a Customer Investment Fund, which was insignificant compared to the $1.2 billion acquisition premium. The Commission erred as a matter of law by failing to expressly address whether it was consistent with the public interest for ratepayers to receive benefits that were minimal compared to the $1.2 billion acquisition premium. That failure constituted a violation of PU § 6-105(g)(2)(v) and (xii), and requires reversal.

For the above reasons, respectfully, I dissent.