*Montgomery Park, LLC v. Maryland Department of General Services*, Nos. 12 & 13, September Term, 2022. Opinion by Eaves, J.

**STATE FINANCE AND PROCUREMENT – MARYLAND STATE BOARD OF CONTRACT APPEALS – LEGAL STANDARD OF REVIEW FOR CANCELLATION OF INTENDED PROCUREMENT AWARDS**

The Supreme Court of Maryland held that in a bid protest filed under the State Finance and Procurement Article of the Maryland Code ("SF"), Title 15, Subtitle 2, the standard of review that the Maryland State Board of Contract Appeals ("Board") must apply to a procurement officer's decision to cancel a request for proposal ("RFP") is the arbitrary or capricious standard.

In this case, the Procurement Officer for the Department of General Services ("DGS") issued an RFP seeking bids for a new lease for the Maryland Insurance Administration ("MIA") headquarters. The Procurement Officer thereafter cancelled the RFP after notifying Montgomery Park, LLC ("Montgomery Park") that it was the intended awardee of the bid for new office space, but prior to approval of the bid by the Board of Public Works. Montgomery Park filed a bid protest with the Board, which reversed the Procurement Officer's decision. The Supreme Court held that the Board erred in concluding that the Procurement Officer's decision was arbitrary and capricious.

**STATE FINANCE AND PROCUREMENT – BID PROTEST – STANDING**

To file a bid protest under State procurement law, the protestor must be an interested party. An interested party is defined as an "actual or prospective bidder, offeror, or contractor that may be aggrieved by the solicitation or award of a contract, or by the protest." Md. Code Regs. 21.10.02.01B(1).

The Supreme Court held that Montgomery Park lacked standing to protest the sole source renewal of the existing lease between MIA and St. Paul Place. The Court held that the RFP for office space and the subsequent renewal of the existing lease were two factually and legally distinct events that must be considered separately. The Court determined that, once the Procurement Officer cancelled the RFP, Montgomery Park was "no longer an 'actual or prospective bidder [or] offeror[.]" With the RFP no longer in effect, under SF § 13-105(g), the Procurement Officer was entitled to proceed with the renewal of the existing lease as a sole-source contract renewal, without soliciting other offers. Because Montgomery Park had no interest in the existing lease and was never in line for an award of a lease renewal under the sole-source renewal provisions of State law, the Court held that it lacked standing to challenge the renewal lease.

Circuit Court for Baltimore City
Case Nos. 24C20000887 & 24C20001565
Argued: October 3, 2022

IN THE SUPREME COURT

OF MARYLAND*

Nos. 12 & 13

September Term, 2022

_____

MONTGOMERY PARK, LLC

v.

MARYLAND DEPARTMENT OF GENERAL
SERVICES

_____

Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,
Harrell, Glenn T., Jr.
    (Senior Justice, Specially Assigned)

JJ.

_____

Opinion by Eaves, J.

_____

Filed: February 24, 2023

* At the November 8, 2022, general election, the
voters of Maryland ratified a constitutional
amendment changing the name of the Court of
Appeals to the Supreme Court of Maryland. The
name change took effect on December 14, 2022.

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

The dispute in this case arises from two decisions of the Maryland State Board of Contract Appeals ("the Board") that sustained two bid protests filed by Montgomery Park, LLC ("Montgomery Park"). In 2017, the Maryland Department of General Services ("DGS"), on behalf of the Maryland Insurance Administration ("MIA"), issued a Request for Proposal ("RFP") for office space. Although Montgomery Park was initially named the intended awardee, DGS, through its Procurement Officer, later cancelled the RFP before the award was presented to the Board of Public Works for approval. After cancelling the RFP for new office space, the Procurement Officer negotiated a renewal of MIA's existing lease at 200 St. Paul Place in Baltimore City.

In response to DGS's actions, Montgomery Park filed two separate bid protests— one relating to the Procurement Officer's decision to cancel the RFP, and a second one relating to the renewal of the existing lease between MIA and St. Paul Place (hereinafter referred to as "St. Paul Plaza" or "leased premise" as appropriate to the context). The Procurement Officer denied both bid protests. The Procurement Officer determined that the cancellation of the RFP complied with the applicable provisions of the State Finance and Procurement Article of the Maryland Code and the Code of Maryland Regulations ("COMAR"). With respect to the second bid protest, the Procurement Officer determined that Montgomery Park did not have standing to challenge the lease renewal, but even if it did, the lease renewal was negotiated pursuant to the provisions of State law that permit the renewal of an existing lease without soliciting other offers. Thereafter, Montgomery Park appealed the Procurement Officer's decisions to the Board, which overturned the Procurement Officer's decisions. The Board determined that the Procurement Officer's

cancellation of the RFP and subsequent lease renewal violated Maryland procurement law. In a separate opinion, the Board concluded that Montgomery Park had standing to challenge the Procurement Officer's renewal of MIA's existing lease. Turning to the merits, the Board ruled that the Procurement Officer violated the procurement law by failing to document separately her reasons for determining that it was in the State's best interest to renew the lease with St. Paul Plaza.

DGS appealed the Board's two decisions to the Circuit Court for Baltimore City, which reversed the Board. Montgomery Park appealed the circuit court's decisions to the Appellate Court of Maryland (at the time named the Court of Special Appeals of Maryland).[1] The Appellate Court affirmed the circuit court's rulings in a reported opinion.[2] Montgomery Park petitioned this Court for a writ of *certiorari*, which this Court granted on June 3, 2022.[3] Montgomery Park presents the following questions for our review, which we have rephrased as follows:[4]

---

[1] At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

[2] *Montgomery Park, LLC v. Maryland Dep't of Gen. Servs.*, 254 Md. App. 73 (2022).

[3] *Montgomery Park, LLC v. Maryland Dep't of Gen. Servs.*, 479 Md. 64 (2022).

[4] The questions presented in the petition for a writ of *certiorari* were:

> 1. Is it arbitrary or capricious for a procurement officer to cancel the proposed award of a procurement contract without making independent "written findings" required by Maryland law to support that decision, and instead relying on someone else's findings that were not supported by the administrative record?

1. Did the Board err in determining that the Procurement Officer's decision to cancel the RFP for an office lease in connection with the relocation of MIA's headquarters was arbitrary and capricious?

2. Did the Board err in determining that Montgomery Park, as the intended awardee of the RFP, had standing to challenge the renewal of MIA's existing lease after the RFP was cancelled?

For the following reasons, this Court answers "yes" to both questions and shall affirm the judgment of the Appellate Court of Maryland.

## I.     BACKGROUND

### A. Statutory and Regulatory Background

Before we discuss the particular facts and procedural background of this case, it is useful to provide an overview of Maryland procurement law.

Title 13 of the State Finance and Procurement Article of the Maryland Code and Title 21 of COMAR govern the solicitation and award of certain state contracts, including an agency's leasing of real or personal property as a lessee. *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 503 (2014); Md. Code Ann., State Finance and Procurement Article ("SF") (1988, 2021 Repl. Vol.) § 11-101(n)(1).

"The procurement process begins with the procurement officer—the individual authorized by an agency to enter, administer, and make determinations and findings with respect to procurement contracts—who selects a procurement method and solicits bids for procurement." *Brawner Builders, Inc. v. State Highway Admin.*, 476 Md. 15, 33–34 (2021)

---

2. Did Montgomery Park have standing to challenge the unlawful award of a sole source contract?

3

(citing SF § 11-101(p) (defining "procurement officer) and SF § 13-102 (permitting procurement officer to solicit bids)). Under COMAR 21.03.04.01, "[e]ach determination required by the State Finance and Procurement Article" or Title 21 of COMAR must be written and "[b]ased on written findings of, and signed by, the person who made the determination[.]"

After a bid is opened, but prior to an award, "if with the approval of the Board, a unit[5] determines that it is fiscally advantageous or otherwise in the best interest of the State, the unit may cancel the invitation for bids, a request for proposals, or other solicitation[.]" SF § 13-206(b)(1); *see also* COMAR 21.06.02.02.02C(1) ("After opening of bid proposals but before award, all bids or proposals may be rejected in whole or in part where the procurement agency . . . determines that this action is fiscally advantageous or otherwise in the State's best interest.").[6] Additionally, if a procurement officer "determines that renewal of an existing lease is in the best interest of the State, the procurement officer may negotiate the renewal without soliciting other offers." SF § 13-105(g); *see also* COMAR 21.05.05.02D ("When it is determined to be in the best interest of the State, the

---

[5] "Unit" is defined as "an officer or other entity that is in the Executive Branch of the State Government and is authorized by law to enter into a procurement contract." SF § 11-101(y)(1). DGS is a "primary procurement unit" with the authority to designate procurement officers to "(1) enter into a procurement contract; (2) administer a procurement contract; or (3) make determinations and findings with respect to a procurement contract" on behalf of the State. SF § 11-101(m)(2), (p)(1)–(3).

[6] SF § 13-206(b)(1) states that a "unit determines" whether the cancellation is in the best interest of the State. In the instant case, DGS is the "unit" for purposes of SF § 13-206(b)(1). DGS's Procurement Officer was Wendy Scott-Napier, who was also the Assistant Secretary of DGS during the pendency of the procurement at issue here.

procurement officer may negotiate the renewal of an existing real property lease without soliciting other proposals.").

Title 15, Subtitle 2 of the State Finance and Procurement Article sets forth the statutory remedies for "dispute resolution." *State Ctr.*, 438 Md. at 505. A bid protest is a "complaint relating to the solicitation or award of a procurement contract." COMAR 21.10.02.01B(2). "A prospective bidder or offeror, a bidder, or an offeror" may submit a protest to the procurement officer." SF § 15-217(a)(1); *see also* COMAR 21.10.02.02A ("An interested party may protest to the appropriate procurement officer against the award or proposed award of a contract[.]"). If the protestor is dissatisfied with the procurement officer's decision, they may appeal to the Board pursuant to COMAR 21.10.07.02.

Under SF § 15-223(a)(1), a decision of the Board is subject to judicial review in accordance with the Maryland Administrative Procedure Act ("APA"), Title 10, Subtitle 2 of the State Government Article ("SG") (1984, 2021 Repl. Vol.). Section 10-222(h) of the State Government Article provides the circuit court with the authority to take the following actions with respect to an agency decision:

    (1) remand the case for further proceedings;

    (2) affirm the final decision; or

    (3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

        (i) is unconstitutional;

        (ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; [or]

\*     \*     \*

(vii) is arbitrary or capricious.

Parties aggrieved by a final judgment of the circuit court may appeal to the Appellate Court of Maryland. SG § 10-223(b)(1).

## B. Factual Background

In August 2017, MIA's headquarters was located at 200 St. Paul Place, in Baltimore City, Maryland. MIA was a tenant under an existing lease with St. Paul Plaza, which was set to expire in May 2019, subject to a five-year renewal option and a six-month holdover period. Based upon concerns about parking options for its employees, MIA requested that DGS issue an RFP for new office space. Approximately twelve vendors submitted proposals, including Montgomery Park and St. Paul Plaza. After the submission period closed, DGS's Procurement Officer, Wendy Scott-Napier (hereinafter referred to as "the Procurement Officer" or "Ms. Scott-Napier") evaluated and listed each proposed location in ranked order. Montgomery Park came in first place, while St. Paul Plaza came in second. Accordingly, Ms. Scott-Napier notified Montgomery Park that it was the recommended awardee for the procurement. DGS chose Montgomery Park over St. Paul Plaza because "[c]urrently . . . not all MIA employees have access to free parking. Montgomery Park

6

operates a surface parking lot where all MIA employees would have access to free parking."[7]

Following DGS's selection of Montgomery Park as the intended awardee, representatives of DGS, MIA, and Montgomery Park met in November 2018 to discuss the logistics of the move from the St. Paul Plaza location to Montgomery Park. Montgomery Park left that meeting "with an understanding that the lease was to be presented to the Board of Public Works in January 2019." However, on March 12, 2019, DGS informed Montgomery Park that the MIA lease would be presented to the Board of Public Works for approval on April 24, 2019.

During the same time in which DGS and Montgomery Park were negotiating the terms of a new proposed lease, Ms. Scott-Napier was also attempting to negotiate a short-term lease extension with St. Paul Plaza to provide additional time for MIA to prepare to move to the Montgomery Park location. A St. Paul Plaza representative, however, rejected the offer. Instead, the representative stated that St. Paul Plaza was only interested in a multi-year lease.

Ms. Scott-Napier and another DGS representative met with a St. Paul Plaza representative on March 29, 2019, to again discuss a short-term lease renewal. There were no notes taken of this meeting, although, in a follow-up email to Ms. Scott-Napier, the St. Paul Plaza representative stated:

---

[7] DGS's other reasons for selecting Montgomery Park included an annual savings of $337,705.27 and a "$3,337,052.70 savings over the full 10-year lease term, after factoring in the agency's moving costs and a moving allowance provided by the landlord."

> I just wanted to send a reminder that in our meeting on March 29th, we determined a [Letter of Intent] **with fully negotiated terms** agreed upon by both parties would be delivered no later than April 24th or we would have to unfortunately continue negotiations with other tenants to fill the MIA space[.]

(Emphasis in original). Ms. Scott-Napier, however, disagreed with this summarization of the meeting and testified that the only purpose of the meeting was to discuss a short-term extension or holdover extension.[8]

As it was preparing to relocate, MIA concluded that the initial justification for the request for proposals—primarily the lack of adequate parking—was not sufficient to justify relocating to an area in which public transit options were not readily available. The Maryland Insurance Commissioner, Alfred Redmer, Jr., was concerned about the impact the proposed location would have on MIA. Accordingly, in a letter dated April 23, 2019, Commissioner Redmer asked DGS to cancel the procurement of the MIA lease. He provided four reasons to cancel the RFP:

1. **The initial justification for the Request for Space has changed and is no longer valid.** The MIA initiated a Request for Space with the intent of offering its staff improved parking options and less street construction and congestion. . . . [However,] it became clear that improved parking options were less critical to staff than access to multiple modes of public transportation; approximately 60% of MIA employees use public transportation to commute to and from work. [Montgomery Park] is not directly accessible by multiple city bus routes, regional commuter buses, Metro and Light Rail. Lack of direct access to [Montgomery Park] will requires employees to board a private [ ] shuttle[.] . . . Members of the

---

[8] At the Board hearing, Ms. Scott-Napier testified that, at the March 29th meeting, "we [DGS] told them we could not discuss [a long-term] lease renewal" and that "we did not discuss terms." According to Ms. Scott-Napier, DGS explained that it would know by April 24—the date of the Board of Public Works meeting—"whether we were moving to Montgomery Park[,]" because we would have sought approval for the lease."

general public will not have access to the private shuttle and will be required to transfer to one of the two bus lines[.]

2. **Employee retention will be significantly adversely impacted.** . . . The MIA anticipates that its relocation to [Montgomery Park] will result in the departure of experienced regulatory staff with the specialized insurance-related knowledge and expertise needed to perform its regulatory functions. An increase in employee turnover and the time and expense to recruit and train new staff will be particularly detrimental to the MIA's operations[.]

3. **Interruption of MIA operations and regulation of Maryland's insurance industry will hurt Maryland consumers and businesses.** The moving cost estimate did not consider the interruption to regulatory operations during the relocation period which is projected to last several weeks. This interruption could have a significant adverse effect upon consumers and the regulation of the Maryland insurance industry.

4. **Insurance companies doing business in Maryland have opposed the move on the basis that it will be the second time in 10 years that these companies must fund the MIA's relocation.** Among other regulated entities, several large insurance companies, one a Maryland domestic company, have complained that the relocation of the agency twice in 10 years is a wasteful expenditure of their funds. The moving cost estimate did not consider that the relocation would increase the cost of doing business in Maryland. Should a company leave the state, this will not only hurt consumers of insurance, but will reduce jobs, and reduce the premium tax revenue.

(Emphasis in original). Commissioner Redmer concluded that it was "in the best interest of the State to cancel this procurement."

That same day, Ms. Scott-Napier sent a letter to Montgomery Park cancelling the RFP. The letter did not state a reason for cancelling the procurement, "only that '[a]t the request of [MIA], [DGS] is canceling [the] RFP [.]'" Ms. Scott-Napier, however, attached Commissioner Redmer's April 23 letter to DGS outlining the reasons MIA wanted to cancel the procurement. She then prepared a Procurement Officer's Written Determination

9

in which she summarized Commissioner Redmer's April 23 letter and concluded that "[b]ased on the rationale presented, I find that the RFP is no longer in the State's best interest and recommend approval of MIA's request."

Having cancelled the RFP, the Procurement Officer then determined that it was in the best interest of the State to renew MIA's lease with St. Paul Plaza, and proceeded to negotiate the renewal of MIA's lease with St. Paul Plaza without soliciting other offers. The Board of Public Works ultimately approved DGS's request to renew MIA's lease with St. Paul Plaza on January 8, 2020.

Montgomery Park filed two bid protests with Ms. Scott-Napier, in her capacity as DGS's Procurement Officer, as provided for in SF § 15-217(a)(1). We examine each bid protest and subsequent appeal in turn.

### C. Montgomery Park's First Bid Protest

Montgomery Park's first bid protest related to Ms. Scott-Napier's decision to cancel the procurement ("First Protest"). Specifically, Montgomery Park contended that "DGS's decision to cancel the RFP was arbitrary and capricious, lacked a rational basis, and was otherwise unreasonable." In support thereof, Montgomery Park argued that the cancellation notice violated COMAR 21.03.04.01 and 21.06.02.02 because there was "no determination made by DGS that cancellation is 'fiscally advantageous or otherwise in the State's best interest,' nor are there reasons offered by DGS why cancellation is necessary." Moreover, according to Montgomery Park, Commissioner Redmer's April 23 letter did not provide "DGS with a rational basis to support its decision to cancel the RFP." Finally, Montgomery Park contended that MIA's reasons for cancellation were "pretextual" and

10

meant "to prevent the State of Maryland from entering into a lease agreement with anyone *other than* St. Paul Plaza." (Emphasis in original).

Ms. Scott-Napier denied Montgomery Park's First Protest. She stated that "[a]fter careful and detailed consideration of all the factors . . . I determined that [ ] the solicitation was no longer justified, and that cancellation of the RFP was fiscally advantageous and in the best interest of the State." Ms. Scott-Napier rejected Montgomery Park's contention that the cancellation notice violated COMAR, reasoning that the "absence of a continued need for the procurement is, in and of itself, a sufficient reason for cancelling the RFP." She determined that MIA had a rational basis for requesting that the RFP be canceled, which was explained in Commissioner Redmer's letter, and that DGS evaluated the concerns, and reached the same conclusion. Montgomery Park appealed DGS's denial of the First Bid Protest to the Board.

### D. Montgomery Park's Second Bid Protest

On September 27, 2019, Montgomery Park filed a second bid protest challenging DGS's decision to renew MIA's lease with St. Paul Plaza ("Second Protest"). To support its claim, Montgomery Park argued that: (1) DGS violated COMAR because the Procurement Officer negotiated the MIA lease with St. Paul Plaza without first determining, in writing, that the lease renewal was in the best interest of the State; (2) it was not in the State's best interest to renew the lease with St. Paul Plaza; and (3) Montgomery Park had proper standing because it was aggrieved by DGS's unauthorized negotiations with St. Paul Plaza and the award of the lease renewal.

11

As a threshold matter, before considering the merits of the Second Protest, Ms. Scott-Napier addressed the timeliness of the bid protest and Montgomery Park's standing. First, she determined that Montgomery Park's Second Protest was untimely. She concluded that Montgomery Park should have, pursuant to COMAR 21.10.02.03B, filed its Second Protest within seven days of July 23, 2019. Second, she concluded that Montgomery Park lacked standing because it was not an interested party to the lease renewal. In other words, Ms. Scott-Napier believed that the lease renewal was solely between DGS and St. Paul Plaza, and therefore did not include Montgomery Park. Finally, Ms. Scott-Napier determined that, even if the protest was timely and Montgomery Park had standing, the protest must be denied on the merits. She reasoned that COMAR does not require the procurement officer to make a written determination prior to negotiating a lease renewal. Montgomery Park appealed DGS's denial of the Second Protest to the Board.

**E. Montgomery Park's First Appeal to the Board of Contract Appeals**

In Montgomery Park's appeal to the Board as to the First Protest, the parties debated the applicable standard of review that the Board must apply when reviewing the Procurement Officer's decision to cancel the RFP. Montgomery Park urged the Board to find that the cancellation was arbitrary or capricious and that there was no rational basis to support the cancellation. For its part, DGS asked the Board to consider whether the cancellation was "so arbitrary as to be fraudulent or a breach of the public trust."

At the Board hearing, Ms. Scott-Napier testified that she canceled the RFP because she determined that it was in the State's best interest to do so. She testified that she knew

of MIA's concerns about moving to Montgomery Park before the April 23, 2019, cancellation, and explained that, "when we met in February we were reviewing the moving costs to address their concerns, but were still working toward seeking approval for the Montgomery Park lease." She stated that she asked Commissioner Redmer to put MIA's concerns in writing. She reviewed Commissioner Redmer's letter and considered MIA's reasons "to be legitimate because of the conversations that I had with MIA," and "[b]ecause I'm hearing it directly from Al Redmer and I take it seriously." Ms. Scott-Napier acknowledged that she did not state her reasons for cancelling the RFP specifically in her letter to Montgomery Park, but explained that she failed to do so because she "felt it had been stated in the Redmer letter" that was attached to her cancellation letter.

Commissioner Redmer also testified at the hearing. He acknowledged that "[o]nce Montgomery Park was announced as the awardee of the RFP, there was instant heartburn" among MIA employees who were not in favor of the move. Commissioner Redmer testified that over time, he became concerned about the move to Montgomery Park:

> Well, there was certainly a cumulative effect. So while I'm hearing heartburn from all these internal and external forces, while we're hearing the heartburn, we're working on a daily basis, my Deputy, in preparing for a move. . . .
>
> As we rounded the end of 2018, I had growing concern about the items that I mentioned and the risk of not having a home. You know, the lease expires May 1 of 2019. We had an automatic extension of six months until November 1st, what? Two weeks from now. You know, as we got into the spring of 2019, you can't move 250 people in 4 or 5 or 6 months. You just can't do it.
>
> So when you look at the fact that we didn't have a lease, I have a lease that's expiring with 250 people that I need to have desks for. That, in addition to all of the other heartburn is what raised my temperature.

13

He testified that he explained his concerns to DGS in his April 23 letter, pointing out that "the issue of parking no longer outweighed everything else."

The Board issued its opinion concerning the First Protest on January 20, 2020. Before addressing the merits, the Board discussed at length the applicable standard of review it was applying to the Procurement Officer's decision to cancel the RFP. The Board noted that the applicable standard of review was "muddled with inconsistencies." To resolve the confusion, the Board provided a detailed analysis of its previous opinions and ultimately concluded that the standard of review is the arbitrary and capricious standard.

Turning to the merits, the Board concluded that the Procurement Officer's process for cancelling the award was flawed. The Board stated:

> In this case, it is clear from the evidence presented, both in documentary form and from witness testimony, that the reasons stated in support of the [Procurement Officer's] determination that it was in the best interest of the State to cancel the solicitation were, in fact, the four reasons asserted by Mr. Redmer for why Mr. Redmer believed it was in the State's best interest to cancel. The [Procurement Officer] wholly adopted Mr. Redmer's reasons as her own, admittedly, without undertaking any significant independent investigation to confirm that the facts stated by Mr. Redmer were accurate. In short, the process by which she made her determination was flawed.

The Board reasoned that the Procurement Officer should not have wholly adopted the MIA Commissioner's reasoning. Instead, according to the Board, it was the Procurement Officer's duty to independently investigate the MIA Commissioner's four reasons for requesting that the intended award be cancelled. The Board opined, because she failed to do so, that the Procurement Officer could not have reasonably concluded that the cancellation of the intended award was in the State's best interest. As such, the Board

14

concluded that the Procurement Officer's decision to cancel the procurement was unreasonable, arbitrary, and capricious, noting:

> In this case, the [Procurement Officer's] abrupt determination that it was in the State's best interest to cancel the solicitation was, in effect, made by the head of the using agency, the MIA, rather than the [Procurement Officer] and the procurement agency, DGS. The process by which the [Procurement Officer] made her determination was flawed: she adopted virtually whole cloth the head of the using agency's reasons for wanting to cancel the procurement without verifying the facts supporting his assertions and exercising her independent judgment based on those verified facts. The stated concerns may well have been legitimate and factually based, but it was incumbent upon the [Procurement Officer] to investigate and determine whether the facts adequately support those concerns and to weigh all the advantages and disadvantages to the State of cancelling this solicitation before making a determination that cancelling was in the State's best interest.

Thus, the Board sustained Montgomery Park's appeal with respect to the First Protest.

### F. Montgomery Park's Second Appeal to the Board of Contract Appeals

Montgomery Park also appealed the Procurement Officer's denial of its Second Protest to the Board. As noted above, Montgomery Park argued that the Procurement Officer violated the State Finance and Procurement Article of the Maryland Code because she failed to make a written determination stating the reasons it was in the State's best interest to renew MIA's lease with St. Paul Plaza.

As a threshold matter, the Board, like the Procurement Officer, addressed the issue of standing. Unlike the Procurement Officer, however, the Board found that Montgomery Park had standing to protest the renewal of MIA's lease with St. Paul Plaza, reasoning that because the lease renewal "arises and flows from the wrongful cancellation of the prior competitive procurement[,]" Montgomery Park was an aggrieved party. In other words,

15

according to the Board, the two bid protests must be considered together when deciding standing.

Likewise, the Board addressed whether Montgomery Park had timely filed its Second Protest. The Board determined that Montgomery Park was obliged to filed its Second Protest within seven days of September 23, 2019. Given that Montgomery Park's Second Protest was filed on September 27, 2019, the Board opined that it was, in fact, timely.

The Board next addressed the merits of the appeal and concluded that the Procurement Officer violated the applicable provisions of COMAR by failing to document her reasons for determining that it was in the State's best interest to renew MIA's current lease. Thus, the Board sustained Montgomery Park's Second Protest.

**G. Judicial Review in the Circuit Court for Baltimore City**

Following the Board's two decisions, DGS petitioned for judicial review in the Circuit Court for Baltimore City. The circuit court issued two memorandum opinions reversing each of the Board's decisions. Regarding the Board's first opinion (January 2, 2020), the court found that when the Board adopted Montgomery Park's espoused standard of review, it departed from its own precedent. Thus, according to the court, the Board acted arbitrarily and capriciously. As to the Board's second opinion (February 8, 2021), the court found that Montgomery Park's protest was untimely. Consequently, the circuit court concluded that the Board lacked jurisdiction to hear the second appeal. Montgomery Park timely appealed the circuit court's two rulings to the Appellate Court of Maryland.

### H. Appellate Court of Maryland

The Appellate Court of Maryland, having consolidated the appeals, affirmed the judgments of the circuit court in a reported opinion. *Montgomery Park, LLC v. Maryland Dep't of Gen. Servs.*, 254 Md. App. 73 (2022). The intermediate appellate court held that the Board's overall conclusion, that the standard of review is one of arbitrariness or capriciousness, was "fundamentally correct." *Id.* at 100. However, the court reasoned that the Board improperly applied this standard by assigning to DGS the burden to independently investigate the MIA Commissioner's reasons for wanting to cancel the procurement. *Id.* at 103.

The Appellate Court of Maryland also determined that Montgomery Park lacked standing to file the Second Protest. The court pointed out that under COMAR 21.10.03.02, only an interested party may file a bid protest, which is defined as "an actual or prospective bidder, offeror, or contractor that may be aggrieved by the solicitation or award of a contractor or by the protest." *Id.* at 106 (citing COMAR 21.10.02.01B(1)). In addition, the court opined that one must be in line for the procurement award to be an interested party. *Id.* at 103. The court determined that, once the Procurement Officer cancelled Montgomery Park's intended award, the relationship between Montgomery Park and DGS was severed. Therefore, the Appellate Court reasoned, Montgomery Park was no longer in line for an award and lacked standing to challenge the decision to renew the lease with St. Paul Plaza.

17

## II.     STANDARD OF REVIEW

"When this or any appellate court reviews the final decision of an administrative agency such as the [Board of Contract Appeals], the court looks through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluates the decision of the agency." *Anne Arundel Cty. v. 808 Bestgate Realty, LLC*, 479 Md. 404, 419 (2022) (citations omitted).

When reviewing an agency's findings of fact "we affirm the agency's decision if there is substantial evidence in the record as a whole to support the agency's findings and conclusions." *Id.* (internal citations and quotations omitted).  Moreover, we presume them to be valid.  *Id.*  This Court, however, reviews conclusions of law *de novo* and we afford the agency "no such deference." *Id.*

## III.     ANALYSIS

The two questions posed by Montgomery Park relate to its first and second bid protests, respectively.  Therefore, we will examine each question presented within the context of the relevant bid protest.  Before we turn to the merits, we first address the proper standard of review that the Board must apply in reviewing a procurement officer's decision to cancel a RFP.

**A. The Standard of Review Applicable to the Board's Review of a Procurement Officer's Decision to Cancel an RFP**

In its first opinion, the Board explained that it has historically used the standard of review articulated in *Hanna v. Board of Education of Wicomico County* when reviewing the cancellation of procurement solicitations and awards. 200 Md. 49 (1952). In *Hanna*, this Court stated:

> On a suit by a taxpayer, a court of equity will not review the exercise of discretion of an administrative agency, if it acts within the scope of its authority, unless its power is fraudulently or corruptly exercised; but the court will restrain an agency from entering into or performing a void or *ultra vires* contract or from acting fraudulently or so arbitrarily as to constitute a breach of trust.

*Id.* at 51 (citations omitted).

The Board noted that its use of the standard of review articulated in *Hanna* has been "muddled with inconsistencies." Particularly, the Board opined that although it often cites *Hanna* in its procurement cancellation cases, the Board's application has varied in several ways. After engaging in a survey of its opinions and the Board's inconsistent application of the standard of review in its procurement cancellation cases, the Board came to two conclusions:

*First*, the Board concluded that the *Hanna* standard of review only applies to courts of equity, and therefore not to the Board:

> [i]t is clear that the standard of review cited . . . in *Hanna* pre-dated the passing of the APA by five (5) years, and thus it was meant to be applied by courts of equity, usually in taxpayer standing. It set a high standard to meet before a court of equity could enjoin the anticipated actions of an administrative agency. But this Board is not a court of equity and does not have equitable powers to enjoin the conduct of administrative agencies.

19

*Second*, the Board concluded that the *Hanna* standard of review is inconsistent with

the APA standard of review:

> [a]lthough the *Hanna* standard has been proliferated throughout the Board's short history of jurisprudence, it does not appear that any of the Board's decisions ever gave more than a passing thought to whether the *Hanna* standard was appropriate post-APA[.]
>
> \*      \*      \*
>
> Lacking any binding or persuasive authority on this issue in Maryland case law, we look to the APA . . . for guidance. Clearly, the *Hanna* standard is inconsistent with the APA Standard of Review that courts use when reviewing administrative decisions in contested cases.
>
> \*      \*      \*
>
> [Because] the 'fraudulent or so arbitrary as to constitute a breach of trust' standard cited by in *Hanna* is considered a higher standard than that set forth in the APA[ ] standard of review, we hereby reject that proposed standard of review. Our standard of review for all bid protests, including cancellations of solicitations before bid/proposal opening and rejection of all bids/protests after bid opening but before award, is this: a procurement officer's decision will be overturned only if it is shown by a preponderance of the evidence that the agency action was biased, or that the action was arbitrary, capricious, unreasonable, or in violation of law.

We agree with the Board's conclusion that, when the Board undertakes a review of

a procurement officer's decision to cancel a RFP, the standard of review is whether the

procurement officer's decision is arbitrary or capricious. We do not, however, agree with

the Board's conclusion that our discussion of the standard of review in *Hanna* is

inconsistent with the arbitrary or capricious standard of review. As articulated by the

Appellate Court of Maryland, the *Hanna* standard of review does not "replace arbitrariness

or capriciousness[.]" *Montgomery Park, LLC*, 254 Md. App. at 102. Instead, it represents

the "sort of conduct that would demonstrate arbitrary or capricious decision-making[.]" *Id.* at 100–03.

The prepositional phrase "as to" in "so arbitrary as to constitute a breach of trust" means to what extent an action will be considered arbitrary. *See As to*, Merriam-Webster's Dictionary (11th ed. 2020). Thus, the Court in *Hanna* merely determined that when an action reaches the point of being a breach of trust, it becomes arbitrary. *Hanna*, 200 Md. at 51. In other words, the *Hanna* Court "phrased the standard in terms of arbitrariness to a degree reflecting fraud or a breach of trust." *Montgomery Park, LLC*, 254 Md. App. at 101.

Accordingly, we hold that, when the Board undertakes a review of a procurement officer's decision to cancel a RFP, the applicable standard of review that the Board must apply is whether the procurement officer's decision was arbitrary or capricious. With the correct articulation of the standard of review, we consider whether the Board correctly applied that standard when reviewing Ms. Scott-Napier's decision in this instance.

**B. Montgomery Park's First Protest—Was the Procurement Officer's Decision to Cancel the RFP Arbitrary or Capricious?**

Montgomery Park argues that the Procurement Officer's cancellation of its intended award was arbitrary or capricious. In support of its claim, Montgomery Park contends that the Procurement Officer needed to independently investigate Commissioner Redmer's four reasons for wanting to cancel the intended award, not just adopt them. Montgomery Park insists that this Court's opinion in *Maryland Office of People's Counsel v. Maryland Public Service Commission* justifies this type of burden-shifting approach. 461 Md. 380 (2018).

In *People's Counsel*, this Court reiterated that the arbitrary or capricious standard is "similar to the standard under federal administrative law." *Id.* at 399 (footnote omitted). In doing so, the Court noted several factors[9] a reviewing court considers when determining if an agency's actions are arbitrary or capricious. *Id.* at 399 n.16. Moreover, we emphasized that it is the "petitioner [who] must overcome [the] very deferential standard to rebut the presumption that the [agency] exercised its discretion properly." *Id.* at 400. In other words, it is petitioner's burden to prove the relevant factors necessary to support a finding that the agency's action was arbitrary or capricious. Thus, in this instance, it is Montgomery Park's burden to provide evidence that the Procurement Officer's cancellation of the RFP was arbitrary or capricious.

Instead, the Board found that the Procurement Officer had an independent duty to investigate and verify Commissioner Redmer's four reasons for wanting to cancel the procurement. The Board's conclusion that the Procurement Officer was required to conduct a "significant independent investigation to confirm that the facts stated by Mr.

---

[9] The factors are whether:

> (1) there is a rational connection between the facts found and the choice made; (2) the decision was based on a consideration of the relevant factors; (3) there has been clear error of judgment; (4) the agency relied on factors which Congress has not intended it to consider; (5) the agency has entirely failed to consider an important aspect of the problem; (6) there is an explanation for a decision that runs counter to the evidence; and (7) the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*People's Counsel*, 461 Md. at 399 n.16 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

Redmer were accurate" has no basis in law. "There is no language in any statute, regulation, Board decision, or case imposing [such] a requirement on" the Procurement Officer. *Montgomery Park, LLC*, 254 Md. App. at 103.

To the contrary, our review of the record supports the conclusion that the Procurement Officer *did, in fact,* exercise her discretion in determining that Commissioner Redmer's four reasons were legitimate. In her testimony before the Board, the Procurement Officer stated that she cancelled the RFP because Commissioner Redmer had articulated reasons why cancellation was in the best interests of the State, and that she agreed with those reasons:

> [COUNSEL FOR DGS]: So based on your review of [the April 23rd] letter, and your discussions with MIA during this April 18 to 23rd timeframe, what was your determination?
>
> [MS. SCOTT-NAPIER]: That we should cancel the RFP.
>
> [COUNSEL FOR DGS]: And did you conclude that it was in the best interest of the State and fiscally advantageous to cancel that procurement?
>
> [MS. SCOTT-NAPIER]: I did. That was in my written procurement officer's determination that was in our file. Not specifically stated in my letter, but I felt it had been stated in the Redmer letter.

We agree with the Appellate Court of Maryland that "[t]his was all that was required of Ms. Scott-Napier." *Id*. at 104.

We further determine that the Board erred when it engaged in a detailed explanation of what, in its view, the Procurement Officer should have done to evaluate whether a relocation to Montgomery Park was in the best interest of the State. In doing so, the Board substituted its judgment for the judgment of the Procurement Officer, Ms. Scott-Napier,

23

and Commissioner Redmer. We agree with the intermediate appellate court that the Procurement Officer was entitled to "rely on the rationale articulated by the head of the tenant agency, who is closer to the needs and concerns than the Board is[.]" *Id.* at 105. Moreover, Montgomery Park offered no evidence or testimony to contradict or undermine Commissioner Redmer's reasons for requesting the cancellation.

In conclusion, we hold that the Procurement Officer's decision to cancel the RFP was not arbitrary or capricious. The record clearly reflects that Commissioner Redmer, the head of MIA, articulated his reasons for why the relocation of this state agency was not in the best interests of the State. Based upon our review of the record, Ms. Scott-Napier exercised her discretion and judgment in determining that Commissioner Redmer's four reasons were persuasive on their face. Montgomery Park offered no evidence or testimony that refuted Commissioner Redmer's reasons for requesting the cancellation or the appropriateness of the Procurement Officer's decision to rely on them.

### C. Montgomery Park's Second Protest—Did Montgomery Park Have Standing?

Turning to the second question presented in this case, Montgomery Park asserts that it had standing to challenge the renewal of the MIA lease with St. Paul Plaza.

Under COMAR 21.10.02.02A, "[a]n interested party may protest to the appropriate procurement officer against the award or the proposed award of a contract subject to this title[.]" An interested party is "an actual or prospective bidder, offeror, or contractor that may be aggrieved by the solicitation or award of a contract, or by the protest*." Id.* 21.10.02.01B(1).

24

Here, the Board concluded that Montgomery Park was an interested party and was aggrieved. In its analysis, the Board considered the First Protest and Second Protest together. The Board opined that Montgomery Park was an actual offeror in the initial competitive procurement, and that, but for the wrongful cancellation of the competitive procurement, the lease renewal between MIA and St. Paul Plaza would not have occurred; therefore, Montgomery Park was "undeniably aggrieved" by the lease renewal. We disagree. For the following reasons, the Board improperly considered the two bid protests together in reaching its conclusion that Montgomery Park has standing to lodge the Second Protest.

The First Protest by Montgomery Park challenged the Procurement Officer's decision to cancel a competitive sealed bidding process for which Montgomery Park was the recommended awardee. Neither party disputes Montgomery Park's standing to protest the cancellation of the procurement. Because the procurement process only involved DGS and Montgomery Park, the promise and the benefits set forth in the proposed award were directed to Montgomery Park, which as "an actual or prospective bidder may be aggrieved by" the cancellation of the procurement. *Id.* 21.10.02.01B(1). We have no quarrel with this finding by the Board as to Montgomery Park's standing to challenge the cancellation.

The Second Protest, however, related to DGS's decision to renew MIA's existing lease pursuant to the statutory and regulatory provisions that permit a sole-source renewal of an existing lease without engaging in a competitive bidding process. *See* SF § 13-105(g) ("If a procurement officer determines that renewal of an existing lease is in the best interests of the State, the procurement officer may negotiate the renewal *without soliciting*

25

*other offers*." (emphasis added)); COMAR 21.05.05.02 (same). We agree with the Appellate Court that "the First Protest and Second Protest are factually and legally distinct events and must be considered separately." *Montgomery Park, LLC*, 254 Md. App at 107. As aptly stated by our colleagues on the intermediate appellate court, "[a]lthough the timeline supports the Board's assertion that the sole-source procurement 'arises and flows' from DGS's decision to cancel the RFP with Montgomery Park, that logical and temporal connection doesn't give Montgomery Park a legal interest in the sole source renewal lease." *Id.*

Second, as the intermediate appellate court observed, "in order to qualify as an interested party and thus to have standing, one must be "in line for award." *Id.* at 107 (quoting *Branch Off. Supply*, MSBCA No. 2437 at 3 (2003), and citing *DESCO Assoc.*, MSBCA No. 2680 at 2 (2010); *James F. Knott Constr. Co., Inc.*, MSBCA No. 2437 at 3 (2004)). We conclude that Ms. Scott-Napier correctly determined that, "[b]ecause Montgomery Park is not the holder of the existing real property lease, even if the protest were to be sustained, Montgomery Park would not be in line for a lease renewal under COMAR 21.05.05.02(D), the COMAR provision permitting DGS to renew the current lease for office space for MIA." Ms. Scott-Napier's cancellation of the RFP severed the relationships between Montgomery Park, DGS, and MIA. Once the RFP was cancelled, Montgomery Park was no longer "an actual or prospective bidder or offeror" under COMAR 21.05.05.(D). With the RFP no longer outstanding, Ms. Scott-Napier was entitled to negotiate the lease renewal with the existing leaseholder as a sole-source contract renewal, without soliciting other offers. *See* SF § 13-105(g). Montgomery Park had no

26

interest in the existing lease and was never in line for the renewal lease between DGS and St. Paul Plaza. Accordingly, we determine that Montgomery Park lacked standing to challenge the decision of the Procurement Officer to renew the lease between MIA and St. Paul Plaza.[10]

## IV.    CONCLUSION

In conclusion, we hold as follows:

1.      In a bid protest, the standard of review that the Maryland State Board of Contract Appeals must apply to a procurement officer's decision to cancel a request for proposals is whether the procurement officer's decision was arbitrary or capricious.

2.      The Procurement Officer's decision to cancel the RFP, after making a recommended award and prior to presenting it to the Board of Public Works, was not arbitrary or capricious.

3.      Montgomery Park lacked standing to protest the sole-source renewal of the existing lease between MIA and St. Paul Plaza.

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

---

[10] Because we hold that Montgomery Park lacked standing, we do not address whether the Second Protest was timely filed or the merits of whether the Board correctly concluded that DGS violated State procurement law by failing to make a written determination that renewing the existing lease was in the best interest of the State.